Fredric C. MUNTWYLER,
Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 82–1882.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 6, 1982.
Decided March 31, 1983.

---

William A. Whitledge, Dept. of Justice, Tax Div., Washington, D.C., for defendant-appellant.

Paul Horowitz, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and HOFFMAN,* Senior District Judge.

PELL, Circuit Judge.

The United States appeals from a decision of the district court awarding appellee Fredric C. Muntwyler (taxpayer) a refund of $1288.30 plus interest for overpayment of taxes. The court ruled that the assignee of the assets of the taxpayer's corporation was entitled to direct that the tax payments he made to the Internal Revenue Service (IRS) be applied to trust fund tax liabilities because the payments were voluntary. The Government contends that the payments were involuntary and thus that the IRS was not bound by the assignee's directions and could apply the payments to non-trust fund tax liabilities.

## I. FACTS

Fredric C. Muntwyler was the president, treasurer, director, and majority shareholder of Air Mid-America Airlines for the period relevant to this case. Air Mid-America was an Illinois corporation formed in 1968. Beginning in late 1972, the company suffered financial losses and ceased doing business in May 1973. Because of these problems, the company failed to pay certain employees' withholding taxes (trust fund taxes) and excise taxes (non-trust fund taxes).

On June 13, 1973, the company assigned all of its assets to Bernard C. Chaitman, who served as a trustee for the benefit of Air Mid-America's creditors. Chaitman was authorized to collect debts payable to the company, sell the company's interests in the assigned assets, and pay the claims of the company's creditors.

In August 1973, the IRS filed a claim with Chaitman for unpaid corporate taxes totalling $32,242.47, representing both trust fund and non-trust fund liabilities. On August 25, 1973, Chaitman presented three checks to the IRS, totalling $12,132.93, all of which directed that they be applied to the trust fund portion of the tax liabilities. The Service accepted the checks but refused to honor the directions for application of the money to the trust fund liability; instead, it allocated the entire amount to the non-trust fund liability.

On November 3, 1976, the IRS assessed the taxpayer $18,633.21 in trust fund taxes and, on November 15, $1,030.02 in non-trust

---

* Walter E. Hoffman, Senior District Judge for the United States District Court for the Eastern District of Virginia, sitting by designation.

fund taxes. On April 15, 1977, the IRS credited the taxpayer's $13,526 unrelated 1976 overpayment to the withholding liabilities. On May 5, 1977, the taxpayer paid $1288.30 toward the tax liabilities, and then filed a claim for a refund. On June 6, 1980, after the IRS rejected his claim for refund of the $1288.30, the taxpayer brought this action for refund in the United States District Court for the Northern District of Illinois. On December 22, 1980, the taxpayer filed a second claim for refund with the IRS, seeking to collect the $13,526 credited from his 1976 overpayment. The IRS rejected the claim and the taxpayer amended his complaint to include a claim for a refund of this money.

Both parties filed motions for summary judgment. On February 26, 1982, the district court granted the appellee's motion, holding that the assignee's payment was voluntary and thus that the IRS should have followed his direction as to the payment. The court awarded the taxpayer $1288.30 plus interest in the amount of $550.55. The court ruled that the claim for a refund of the $13,526 in credited overpayments was barred by the statute of limitations, a ruling that the taxpayer does not contest. The Government appealed.

## II. VOLUNTARINESS

■ The Internal Revenue Code directs employers to deduct and withhold a tax upon wages paid. 26 U.S.C. § 3401(a). The withheld taxes are deemed to be held in a special fund in trust for the United States, *id.* § 7501(a), and accordingly every person required to collect and pay over such a tax (including an officer of the corporation, like the taxpayer here, *id.* § 6671(b)) is personally liable for the full amount of the tax not paid, *id.* § 6672. An individual, like the taxpayer, is not personally liable for unpaid non-trust fund taxes. What the taxpayer sought to do in this case was to extinguish his personal liability for unpaid trust fund taxes by having the assignee direct that the payments be credited against the trust fund liability.

■ When a taxpayer makes voluntary payments to the IRS, he has a right to direct the application of payments to whatever type of liability he chooses. *O'Dell v. United States,* 326 F.2d 451, 456 (10th Cir. 1964). If the taxpayer makes a voluntary payment without directing the application of the funds, the IRS may make whatever allocation it chooses. *Liddon v. United States,* 448 F.2d 509, 513 (5th Cir.1971), *cert. denied,* 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972).

■ When a payment is involuntary, IRS policy is to allocate the payments as it sees fit. Policy Statement P–5–60, *reprinted in Internal Revenue Manual* (CCH) 1305–15. This rule has been uniformly followed by the courts. *See, e.g., United States v. De Beradinis,* 395 F.Supp. 944, 952 (D.Conn. 1975), *aff'd mem.,* 538 F.2d 315 (2d Cir. 1976). Despite the appellee's objection, we accept this rule as sensible tax policy. The sole question, therefore, is whether the district court correctly held that the assignee's payment was voluntary.

The Government's position is that a payment is involuntary if it is made pursuant to administrative or judicial action. The Government claims that by submitting a claim for unpaid taxes to the assignee, the IRS took administrative action sufficient to make the resulting payment involuntary. The district court, by contrast, held that court involvement or administrative seizure of property was required to make a payment involuntary.

A starting point for ascertaining whether the payments were voluntary is the Tax Court's frequently cited definition of involuntary payments in *Amos v. Commissioner,* 47 T.C. 65, 69 (1966): "An involuntary payment of Federal taxes means any payment received by agents of the United States as a result of distraint or levy or from a legal proceeding in which the Government is seeking to collect its delinquent taxes or file a claim therefor." The Government contends that this case falls within the *Amos* definition of involuntariness because the claim it filed was an administrative action, just as a levy is an administrative action.

We disagree. The distinction between a voluntary and involuntary payment in *Amos* and all the other cases is not made on the basis of the presence of administrative action alone, but rather the presence of court action or administrative action resulting in an actual *seizure* of property or money as in a levy. No authorities support the proposition that a payment is involuntary whenever an agency takes even the slightest action to collect taxes, such as filing a claim or, as appears to be a logical extension of the Government's position, telephoning or writing the taxpayer to inform him of taxes due.

The strongest indication that our holding is correct is the language of the IRS policy statement on which the Government bases its claim in this case. In discussing 26 U.S.C. § 6672, the section making a corporate officer liable for trust fund taxes, the statement says: "The taxpayer, of course, has no right of designation in the case of collections resulting from *enforced collection measures*." Policy Statement P–5–60, *reprinted in Internal Revenue Manual* (CCH) 1305–15 (emphasis added). Use of the phrase "enforced collection measures" belies the Government's contention that any administrative action is enough to render payment made in response to that action involuntary. We do not understand how the Government can reasonably argue that merely filing a claim for back taxes is an "enforced collection measure."

Furthermore, the cases uniformly define an involuntary payment as one made pursuant to judicial action or some form of administrative seizure, like a levy. A recent case on the subject is *Arnone v. United States,* 79–1 U.S. Tax Cas. (CCH) ¶ 9356 (N.D.Ohio 1979). There, the court held that the payment was involuntary because it was pursuant to a levy on a bank account: "[T]he plaintiff had no right to direct the application of funds obtained through enforced collection by administrative seizure." *Id.* at 86,846. Similarly, the court in *United States v. De Beradinis,* 395 F.Supp. 944 (D.Conn.1975), *aff'd mem.,* 538 F.2d 315 (2d Cir.1976), held that payments were involuntary where "they resulted from Internal Revenue levies or participation in litigation." *Id.* at 952.

Cases holding that payments made in bankruptcy are involuntary do not support the Government's position because court action is involved. In *First National City Bank v. Kline,* 439 F.Supp. 726, 729 (S.D.N.Y.1977), the court held the payments involuntary, saying that "[w]here, as here, moneys are repaid under judicial order, the court has exclusive authority to apply the funds." Likewise, in *O'Dell v. United States,* 326 F.2d 451, 456 (10th Cir.1964), the court said that a debtor could not direct application of his money to such debts as he chose "where, as here, the payment is made involuntarily as in an execution or judicial sale." In the instant case, there was no levy, judicial order, execution, or judicial sale; rather, there was a mere filing of a claim.

The Government contends that *In re Bulk Sale of Inventory,* 6 Kan.App.2d 579, 631 P.2d 258 (1981), supports its position that administrative action is sufficient to render a payment involuntary. In that case, the corporation turned over its assets to auctioneers, who sold them. The auctioneers then deposited the sale proceeds into the registry of a state district court and filed an interpleader action requesting that creditors of the corporation be permitted to file their claims in the court, which would determine the amount to which each was entitled. The United States filed a claim with the court for unpaid withholding taxes. The district court directed payments to the Government. 631 P.2d at 259–60.

Although the Government argues that the involvement of the court was irrelevant to the Kansas court's ruling, the language of the case shows that it was *precisely* the court's involvement that was dispositive. The court said that although the debtor's act of turning over the corporation's assets to auctioneers was voluntary, "when the sums derived from that sale were paid into the district court and creditors were advised

to file claims *so that the court could decide the amount and priority to which each was entitled,* the payments *so ordered* were involuntary." 631 P.2d at 262 (emphasis added).[1]

Finally, the Government argues that the situation in the instant case "is in no material respect different than if ... the Government had seized corporate assets to satisfy the corporate liability or had filed a claim in a bankruptcy[2] or receivership proceeding." This simply is wrong. That the IRS *could have* seized the assets does not mandate that we hold that filing a claim is the same as seizing the property. We will not interpret "involuntary" to mean something completely at odds with the normal understanding of the term and against all authority simply to reach an arguably desirable result or to correct what may have been a mistake in collection tactics by the IRS.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

---

1. In two other cases, *Liddon v. United States,* 448 F.2d 509, 513 (5th Cir.1971), *cert. denied,* 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972), and *Abrams v. United States,* 333 F.Supp. 1134, 1140, 1145 (S.D.W.Va.1971), the courts did not reach the distinction between involuntary and voluntary payments because the taxpayers had not attempted to direct how the funds were to be applied.

2. The Government might have been correct in its claim if the corporation had been in bankruptcy, which it was not. An assignment for the benefit of creditors is an act of bankruptcy and presumably any creditor, including the Government, could have proceeded to file an involuntary petition for bankruptcy based thereon, but no creditor, including the Government, did so. We do not equate the assignment for the benefit of creditors with a formal bankruptcy proceeding.