ANDREW L. STONE AND M. JEANNE STONE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stone v. Commissioner
Docket No. 7277-78.
United States Tax Court
T.C. Memo 1984-187; 1984 Tax Ct. Memo LEXIS 483; 47 T.C.M. (CCH) 1502; T.C.M. (RIA) 84187; April 16, 1984. Michael I. Saltzman, for the petitioners. Adeline P. Malone, for the respondent. WILBUR
MEMORANDUM OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1972
$132,375
1973
183,209
1974
171,861
1975
167,502
*485 The issues presented for our decision are: (1) whether petitioners are taxable on interest income produced during the taxable years 1972 through 1975 by assets held in escrow by the St. Louis Union Trust Company; (2) whether petitioners are taxable on dividend and interest income produced during the taxable years 1972 through 1975 by securities held under a Delaware sequestration order; and (3) whether petitioners are entitled to interest expense deductions for levied amounts and overpayments in Federal income tax which they directed were to be applied to the interest portion of their tax liabilities for earlier years but which respondent applied to the principal. This case was submitted for decision fully stipulated. The stipulation of facts and the attached exhibits are incorporated herein by reference. Andrew L. Stone (Stone) and M. Jeanne Stone (Jeanne) filed joint Federal income tax returns for the 1972 through 1975 taxable years with the Internal Revenue Service Center at Holtsville, New York. At the time they filed the petition in this case, petitioners were legal residents of St. Louis, Missouri. In 1969, the United States by the Civil Division of the Justice *486 Department brought two separate civil actions against Stone and others alleging violations of the False Claims Act (March 2, 1863, Ch. 67, 12 Stat. 696, 31 U.S.C. secs. 231-235) and the Anti-Kickback Act (March 8, 1946, ch. 80, 60 Stat. 37, 41 U.S.C. secs. 51-54) arising out of sales of rocket launchers to the Department of the Navy. One action was instituted in the United States District Court for the Eastern District of Missouri and the other was instituted in the District Court for the District of Columbia. In those actions, the United States claimed single damages of over $6,000,000 and double that amount for violations of the False Claims Act. To ensure payment of any judgment the United States might ultimately obtain against him in the Missouri action, and to avoid attachment proceedings by the United States, Stone entered into an escrow agreement (the Escrow Agreement) with the United States and the St. Louis Union Trust Company (the Trust Company) on July 24, 1970. Pursuant to the Escrow Agreement, Stone deposited $2,500,000 par value of short-term bonds and United States Treasury Bills and 21,600 sheares of stock of Concord *487 Control, Inc., representing 100 percent of the stock of that company, into an escrow account at the Trust Company. Pending resolution of the civil action, the Trust Company agreed to hold the escrowed securities and to reinvest any proceeds collected. The Trust Company further agreed that it would deposit any dividends and interest received on the escrowed securities into Stone's account at the First National Bank in St. Louis. As to the property not transferred to the escrow account and the income on the escrowed assets, Stone was prohibited from making a "sale, transfer or any other disposition," except for reasonable living expenses or for full and valuable consideration. With respect to the Civil Division of the Department of Justice, the Escrow Agreement provided: The United States agrees that, so long as Stone shall not be in default under any of his agreements hereunder, the Civil Division of the United States Department of Justice will not institute attachment proceedings against the property and assets of Stone, and shall use its best internal efforts to dissuade any other agency of the United States from proceeding by way of attachment or other lien against the property *488 and assets of Stone. On February 7, 1972, the District Director of Internal Revenue, St. Louis, Missouri, made jeopardy assessments of income tax against petitioners for the years 1963 through 1967 as follows: Year
Amount
1963
$257,232.05
1964
2,020,762.46
1965
2,918,445.50
1966
1,488,674.07
1967
423,747.65
On February 8, 1972, the District Director filed a notice of lien upon "all property and rights to property" of petitioners, and a revenue officer served a notice of levy on the Trust Company. The revenue officer did not demand immediate payment to the Internal Revenue Service (the Service) of either the principal held in escrow or the income therefrom, but instructed the Trust Company to retain the principal and to withhold income it thereafter received from payment to petitioners or others. From the date of service of the original notice of levy on February 8, 1972, through December 31, 1975, the Trust Company segregated and accumulated the income it received in a separate account, and did not pay the amounts to Stone. In 1972, after having received a notice of deficiency reflecting the amounts of the jeopardy assessments made against them, *489 petitioners filed separate petitions in this Court contesting the amount of the assessments made for the years 1963 through 1967: docket Nos. 5311-72 (Stone) and 5312-72 (Jeanne). A Division of this Court has issued its opinion, Rosenbaum v. Commissioner,T.C. Memo. 1983-113. In August of 1974, Stone filed a complaint against the Service, in the United States District Court for the Southern District of New York, seeking to enjoin collection from him under the jeopardy assessment. During the pendency of that action, the Service made a second levy on the assets and income held by the Trust Company. The second notice of levy dated July 16, 1975, and a first final demand dated July 30, 1975, were served on the Trust Company on July 30, 1975. The revenue officer, at the time the levy was served, gave the Trust Commpany oral instructions to continue to hold the escrowed assets and income. The second notice of levy reflected the amount of the original assessments against petitioners, plus statutory additions for a total demanded amount of $10,601,053.91. On December 2, 1975, the New York action was dismissed on the ground that, by virtue of the Anti-Injunction Act, *490 26 U.S.C. sec. 7421, the district court lacked subject matter jurisdiction to enjoin the Service from enforcing a jeopardy assessment. Stone v. United States,405 F. Supp. 642 (S.D. N.Y. 1975), affd. without published opinion 538 F.2d 314 (2d Cir. 1976), cert. denied 429 U.S. 921 (1976). On March 9, 1976, a third notice of levy along with a second final demand were served on the Trust Company. The notice of levy reflected the amount due of the jeopardy assessments against petitioners and statutory additions to tax for a total demanded amount of $11,535,357.40. At that point, the Trust Company contacted Stone, and, on March 12, 1976, Stone's attorney demanded by telegram that the Trust Company refuse to honor the levy and threatened legal action against the Trust Company if any funds were turned over to the Service. Accordingly, on March 15, 1976, the Trust Company instituted an interpleader action in the United States District Court for the Eastern District of Missouri, naming Stone and the United States, as represented by the Assistant Attorney General of the Civil Division, the District Director, and the revenue *491 officer who served the notice of levy. In its complaint, the Trust Company alleged, among other things, that since the date of the 1972 levy it had accumulated income from the escrowed securities in a separate account. It asked the Court to (1) enjoin all the parties from instituting any action against the Trust Company "until the Court determine[d] that the levy upon the Principal and Income herein paid into the Court ha[d] been properly made"; (2) allow the Trust Company to pay the principal and income into Court, interplead the parties, and discharge the Trust Company; (3) declare the Trust Company's rights and duties under the Escrow Agreement, notice of lien, notices of levy, and final demands; and (4) award the Trust Company its costs, including attorneys fees. Before any answer or other pleading had been filed, the Service, on April 22, 1976, served on the Trust Company a release of levy, releasing the principal held by the Trust Company under the Escrow Agreement from the effect of the levies. On February 22, 1978, the district court hearing the interpleader action entered an order (a) granting summary judgment in favor of the United States, (b) ordering income held *492 and thereafter received by the Trust Company paid to the Service and (c) dismissing the Trust Company's interpleader action. Stone appealed the order to the Court of Appeals for the Eighth Circuit. On March 11, 1980, the Court of Appeals affirmed the decision of the District Court. Accepting the position of the United States, the court held in part: "[T]heTrust Company had a fixed contractual obligation to pay the Income [from the escrowed securities] to Stone as it was earned. The IRS could and did seize that right to satisfy his unpaid tax liabilities. [St. Louis Union Trust Company v. United States,617 F.2d 1293, 1302 (8th Cir. 1980).] On July 5, 1972, the United States commenced an action against Jeanne and others in the United States District Court for the District of Delaware. In that action, the Government sought a money judgment against Jeanne in the amount of the jeopardy assessments and an order by the court sequestering her shares for stock and debentures in Delaware corporations until she appeared generally. On July 5, 1972, the District Court issued a sequestration order against Jeanne appointing a sequestrator to seize and hold certain *493 stocks and debentures she owned and to refuse to pay over dividends and interest paid on the sequestered stocks and debentures pending further order of the court. From the date of the sequestration order, and during the years 1972 through 1975, the sequestrator received and held the dividends and interest earned on the sequestered stocks and debentures, and did not pay them to Jeanne. Petitioners did not include as income on their Federal income tax returns for the years 1972, 1973, 1974, and 1975, either the interest income received by the Trust Company or the interest and dividend income received by the sequestrator. To their 1972 return, petitioners attached the following statement: On February 8, 1972, the United States Government levied against the assets of the taxpayers, and further estoppel resulted from a sequestration order dated July 5, 1972, in the matter of the United States vs. Jeanne Stone. As a result of these actions, certain of the income, resultant from assets held in escrow by the St. Louis Union Trust Co., under an agreement dated July 24, 1970 between Andrew L. Stone and the United States of America and other securities which were in the possession of the *494 taxpayer, were not and have not been received by the taxpayers, and consequently have not been reported in the income tax return for 1972. The same statement was attached to their returns for the years 1973, 1974, and 1975. Petitioners filed their 1972 Federal income tax return in June of 1973. On that return, petitioners attached a statement instructing respondent to apply the amounts seized ($99,985.67) by other levies served in that year to the interest portion of the jeopardy assessments for their 1963 - 1967 years. Petitioners deducted that amount as interest expense for 1972. Petitioners elected to apply a claimed overpayment in tax for 1972 in the amount of $33,607.22 to estimated tax for the year 1973. Respondent Applied the claimed overpayment to the principal portion of the jeopardy assessments for the years 1963 through 1967. On their 1973 Federal income tax return, petitioners attached a statement instructing respondent to apply the amounts seized ($79,950.27) [1] by the other levies served during the year 1973 to the interest portion of the jeopardy assessments, and claimed an interest expense deduction therefor. Petitioners also claimed they had made an overpayment *495 in tax for 1973 of $20,563.07. They directed that $400 of that amount be applied to their estimated tax for 1974, and claimed a refund of $20,163.07. [2] Respondent applied the entire overpayment for 1973 to the principal portion of the jeopardy assessments. On their 1974 Federal income tax return, petitioners attached a statement instructing respondent to apply the seized 1973 overpayment of $20,563.07 to the interest portion of the jeopardy assessments, and claimed an interest expense deduction therefor. They claimed an overpayment in tax for 1974 of $9.542, which they directed respondent to apply to the interest portion of the jeopardy assessments. Respondent applied the $9,542 overpayment to the principal portion of the jeopardy assessments. On their 1975 Federal income *496 tax return, petitioners claimed an interest expense deduction for the amount of their 1974 overpayment, which they had instructed respondent to apply to the interest portion of the jeopardy assessments for 1963 through 1967. By notice of deficiency dated March 31, 1978, respondent determined that petitioners realized unreported taxable income from interest on the escrowed assets held by the Trust Company and dividends and interest on the bonds and debentures held by the Delaware sequestrator. Respondent also disallowed petitioners' interest expense deductions for the years in issue. This case involves a redetermination of the income tax liability of petitioners for the taxable years 1972, 1973, 1974, and 1975. The deficiencies respondent has determined to be due for those years result from actions taken by respondent in the years 1972 through 1975 to collect jeopardy assessments made against petitioners for the years 1963 through 1967. To collect the amount of those jeopardy assessments, respondent served notices of levy on the St. Louis Union Trust Company seizing Stone's right to future income from certain escrowed property. Respondent also instituted sequestration proceedings *497 to sequester stock and debentures owned by Jeanne in Delaware corporations. The primary issue in this case is the validity of respondent's determination that petitioners are taxable on the interest and dividend income received and held by the escrow agent and sequestrator and no paid to petitioners. The ancillary issue involves petitioners' entitlement to interest expense deductions claimed for the amounts respondent seized by other levies, which amounts petitioners instructed were to be applied to the interest portions of the jeopardy assessments against them. Respondent's position is that the interest from the escrowed property is properly includable in petitioners' income for the years in which such interest was earned. He contends that, by virtue of the several levies, petitioner Stone effected an involuntary assignment of income from the assets held by the Trust Company and that such income is therefore taxable to Stone in the years in which it was earned. Petitioners maintain respondent, by serving a notice of levy on the Trust Company in February 1972, seized any right Stone had in and to interest income received by the Trust Company after the date of the levy. They argue *498 such was the legal effect of the 1972 levy as finally decided by the Court of Appeals for the Eighth Circuit. St. Louis Union Trust Company v. United States,617 F.2d 1293 (8th Cir. 1980). Petitioners additionally contest the deficiencies on the grounds that they neither actually nor constructively received the income at issue.
We shall address petitioners' second argument first. [3] It is crystal clear from the facts that petitioners were not in actual receipt of the income in question, and they argue forcefully that they did not constructively receive the income in question during the years in issue either. Petitioners contend that, irrespective of the legal effect of the 1972 and subsequent levies, Stone did not have unfettered command over the interest paid on the escrowed assets. They argue that, after serving the notices of levy, the Service exercised control over the interest through the instructions of its revenue officers and effectively withheld the payment of that interest from Stone. Petitioners point to the fact that the Trust Company accumulated the income from the securities from the date of service of the original notice of levy on February 8, 1972, through *499 December 31, 1975. Thus, they contend the conditions justifying application of the doctrine of contructive receipt simply are not present. We agree with petitioners that Stone was not in constructive receipt of the interest income during the taxable years in issue. It is settled law that income which is subject to a taxpayer's unfettered command and that which he is free to enjoy at his own option is taxed to him as his income whether he sees fit to enjoy it or not.See Corliss v. Bowers,281 U.S. 376 (1930). The doctrine of constructive receipt is applied where a cash basis taxpayer is presently entitled to money which is made immediately available to him and his failure to receive it is due entirely to his own volition. In other words, "[a] taxpayer may not deliberately turn his back upon income and thus select the year for which he will report it." Hamilton National Bank of Chattanooga, Administrator v. Commissioner,29 B.T.A. 63, 67 (1933); Adams v. Commissioner,20 B.T.A. 243 (1930), *500 affd. 54 F.2d 228 (1st Cir. 1931). The doctrine of constructive receipt is developed by regulations under section 446(c). [4]Section 1.446-1(c)(1)(i), Income Tax Regs., provides as follows: Generally, under the cash receipts and disbursements method in the computation of taxable income, all items which constitute gross income (whether in the form of cash, property, or services) are to be included for the taxable year in which actually or constructively received. * * * Section 1.451-2(a), Income Tax Regs., which sets forth the general guidelines as to the constructive receipt of income, provides: Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject *501 to substantial limitations or restrictions. * * * In the case before us, respondent's levies caused the income from Stone's escrowed securities to be accumulated and withheld from him. While the income was segregated in a special account, or "set apart," it was not set apart for or made available to Stone so that he could draw upon it. Respondent's revenue officers had instructed the Trust Company to withhold payment of the interest income from Stone or others. Indeed, while the Trust Company had a fixed contractual obligation to pay the income from the escrowed securities to Stone as it was earned, the Eighth Circuit specifically found that the IRS "seize[d] that right." St. Louis Union Trust Company v. United States,supra at 1302. Thus, Stone had no unfettered command over the interest. Quite the contrary, for in the words of the regulations, his "control of its receipt [was] subject to substantial limitations or restrictions," and that interest cannot be taxable to him during the years in issue. See Corliss v. Bowers,supra.A review of the herculean efforts Stone made to acquire access to the money makes it clear that "command" *502 is the wrong word to describe Stone's relationship to this income, and that any command he had was heavily fettered. The parties stipulated, and we have so found, that the Trust Company accumulated and withheld payment of the interest income from Stone from February 8, 1972, through December 31, 1975. Accordingly, as noted earlier, it is clear that there was no actual receipt of the disputed income. Moreover, it is clear from the record that the Trust Company during that period did not surrender that income to the Service, so there was no income to Stone by virtue of a satisfaction of his tax liabilities. See Old Colony Trust Co. v. Commissioner,279 U.S. 716 (1929).[5] See also Farr v. Commissioner,11 T.C. 552, 563-564 (1948), affd. 188 F.2d 254 (6th Cir. 1951). We turn next to the issue involving dividends and interest earned *503 on Jeanne's sequestered shares of stock and debentures.Respondent argues Jeanne constructively received such income because, under the Delaware sequestration statutes, she could have obtained release of her sequestered property by (1) entering a general appearance before the court or (2) providing security for the release of the property. Failure to choose either of these options, according to respondent, was the equivalent of the income having been made available to Jeanne, with Jeanne turning her back on its receipt. On the contrary, petitioners argue there could be no constructive receipt of the income as both of the options available to Jeanne constituted substantial limitations or restrictions on her control of its receipt. They argue, further, the Delaware sequestration statute is similar in effect to a levy under section 6331, and Jeanne's rights and interest in the stock and debentures were therefore transferred to and held by the sequestrator. Our analysis of the doctrine of constructive receipt leads us to the same conclusion as we reached with respect to Stone. Under Delaware law, a share of stock in a Delaware corporation continues to have its situs in Delaware, no *504 matter where the stock certificate is physically located. Del. Code Ann. tit. 8, sec. 169 (1975). Under a statutory procedure of Delaware law called sequestration, a nonresident may be compelled to appear when an action is instituted in a Delaware court against the nonresident. [6] The court is authorized to seize the defendant's property and appoint a sequestrator to hold the property until such time as the defendant personally appears before the court, or defaults. The defendant may, after making a general appearance, apply for a court order releasing the seized property. The court will release such property unless the plaintiff in the action establishes to the court that such release will result in a substantial likelihood that a judgment obtained by the plaintiff will not be satisfied. Also, the defendant has the absolute right at any time to give the court security for the release of the sequestered property. Del. Code Ann. tit. 10, par. 366 (1975 & Supp. 1980). [7]
*505 The parties stipulated that the sequestrator held the income from the sequestered assets and did not pay those amounts to Jeanne. Thus, there was obviously no actual receipt of the income. We agree with petitioners there was no constructive receipt of such income as well, due to the substantial restrictions placed on its availability by the Delaware sequestration statute. Section 1.451-2(a), Income Tax Regs.
Jeanne's alternative of posting security for the release of her assets and income did not significantly alter the substantial restrictions on her right to receive such income. The tax sought to be collected from Jeanne in the Delaware action exceeded $7 million. Jeopardy assessments in that amount had been made against petitioners before the Delaware action as a result of which all their property was already subject to a tax lien in the amount of the assessment. Subsequent levies showed the Service's claim for tax increased to more than $11 million and it had a lien in that amount on all "property" and "rights to property" of petitioners. Thus, only to the extent that petitioners had property in excess of $11 million could Jeanne post security for release of the sequestered *506 assets.And this analysis is without regard to the enormous liabilities facing petitioners in the civil fraud litigation then pending in the United States District Court. We hold, therefore, that Jeanne was not in constructive receipt of the income from the escrowed securities during the years 1972 through 1975, and is not taxable on that income. Cf. Estate of Paul v. Commissioner,11 T.C. 148 (1948). For similar reasons, even if Jeanne had been willing to appear and subject herself to personal jurisdiction in Delaware, only the most fanciful imagination would have anticipated the release of the $678,670 in assets involved. In view of the ball park figures involved ($11 million in the tax litigation plus the enormous potential liability in the civil fraud suit), the District Court in Delaware would, we believe, have concluded that release of the funds would "render it substantially less likely that plaintiff will obtain satisfaction of any judgment secured." Respondent argues a great deal about where technical title to the assets lies. In this respect the seizure provision under Delaware law appears similar to the seizure provision of the Internal Revenue Code, *507 and technical title undoubtedly resided with the petitioners. See United States v. Whiting Pools, Inc.,     U.S.     (1983). But refinements of title do not obscure the substantial limitations and restrictions of the sequestration order that make any assertion of "unfettered control" by Jeanne wholly implausible. For the order appointed the sequestrator to "seize and hold * * * those shares of stock and debentures * * * along with the rights to any dividends or other contractual rights associated with said stock and debentures." The corporations involved were required to make any payments to the sequestrator, and "any such obligation, right, debt or credit may be discharged by the payment of the sums due from any of said corporations to the sequestrator." The order contains many similar provisions that need not be set out in detail. Accordingly, the facts before us are distinguishable from those of the case cited by respondent. In Aramo-Stiftung v. Commissioner,172 F.2d 896 (2d Cir. 1949), affg. 9 T.C. 947 (1947), dividends on stocks were paid to brokers in the years 1940 through 1943 and retained by them as unclaimed funds. In 1945, *508 the taxpayer advised the brokers that it owned the stock and asked for the dividends. The brokers refused and asked for more evidence as to ownership.The Court of Appeals for the Second Circuit held that the dividends were constructively received and thus taxable in the years 1940 through 1943 because the dividends would have been available to the taxpayer in those years upon presentation of the material later required. In our view, the substantial restrictions and limitations in the present case are in no way comparable to a refusal to present evidence of ownership. The last issue confronting us is the deductibility of certain amounts (separate from and unrelated to the amounts involved in the first two issues) which respondent seized and collected to satisfy petitioners' alleged tax liabilities for the years 1963 through 1967, and which petitioners at some point directed were to be applied to the interest portion of the jeopardy assessments. Petitioners contend they are entitled to interest expense deductions under section 163 [8] because as debtors they were entitled to and did designate that the partial payments they made be applied to interest. We are referred to Rev. Rul. 73-305, 1973-2 C.B. 43, *509 modified by Rev. Rul. 79-284, 1979-2 C.B. 83, which states that where additional taxes, penalty, and interest are assessed against a cash-basis taxpayer, a voluntary partial payment tendered to and accepted by the Service with specific directions by the taxpayer as to its application will be applied in accordance with such directions. The amount of interest satisfied by such partial payment will, to the extent of the taxpayer's liability, be deductible as interest expense. However, where there are no specific instructions as to the application of the payment, the Service will apply such payment to tax, penalty, and interest, in that order, for the earliest period, then to tax, penalty, and interest, in that order, for the next succeeding period, until the payment is absorbed. The Service treats payments made involuntarily the same as voluntary payments made without specific instructions. See Amos v. Commissioner,47 T.C. 65 (1966). The dispute here basically involves two *510 questions: first, the nature of the payments made by petitioners (i.e. voluntary v. involuntary); and second, the timeliness or efficacy of their instructions as to application of such payments. As noted, respondent applies the above-cited revenue ruling only to voluntary payments, arguing for different treatment for involuntary payments effected through the Service's power of levy and distraint. See Muntwyler v. United States,703 F.2d 1030 (7th Cir. 1983), affg. an unreported District Court decision; Amos v. Commissioner,supra.[9] He notes that we were concerned with involuntary payments in Amos and held that respondent may "apply these involuntary payments as he sees fit." 47 T.C. at 70. Petitioners, on the contrary, argue none of the above-cited pronouncements on the subject dealt with jeoperdy *511 assessments. They reason that, because respondent issued a jeopardy assessment against them on February 7, 1972, and served at least one levy upon their property on February 8, 1972, they had, in reality, no meaningful opportunity to make voluntary payments. Petitioners make the same argument as to a levy on their property in 1973. (As noted earlier, these levies and the property involved are separate from those discussed in the first two issues). With respect to the overpayments of income tax made for the years 1973, 1974, and 1975, they urge us to consider those as voluntary payments, since the overpayments did not exist until their returns for those years were filed. Cf. Kavanagh v. Noble,332 U.S. 535 (1947); Jones v. Liberty GlassCo.,332 U.S. 524 (1947). After carefully considering the facts before us, we find we cannot agree wholeheartedly with either party. We agree that petitioners had no opportunity to make a voluntary payment in 1972 and 1973 subsequent to the jeopardy assessments. When a jeopardy assessment is made, the Service may take immediate collection action. Section 6861(a); section 6331(a); see section 6213(a). Once *512 it gives a taxpayer notice of the assessment and demands payment, the Service may proceed to levy upon property without waiting 10 days, as it must in the normal case, for a taxpayer to make payment. Section 6331(a). [10] It is clear the Service made such a jeopardy demand here because it levied upon property of petitioners the day after the assessment. [11] Consequently, petitioners had no real opportunity in 1972 to make a voluntary payment of the amounts involuntarily collected. However, petitioners' direction as to the levied assets' application to interest cannot be held to be timely. The first levy was served on February 8, 1972, and petitioners did not inform the Service they wished the seized assets to be applied against the interest portion of the jeopardy assessments until nearly a year and a half later, in June of 1973, when they then made their wishes known on their 1972 income tax return. This procedure, questionable as to methodology, was clearly untimely. Respondent, therefore, was free to apply the amounts seized as he saw fit. Similarly, petitioners made no effort promptly to notify respondent as to the 1973 levy of any special application desired. Rather, they *513 again waited until they filed their return the following year, and respondent is accordingly sustained. Petitioners reported overpayments of income tax on their 1972, 1973 and 1974 returns. They directed that all or *514 a portion of the overpayments for 1972 and 1973 be applied against estimated tax for 1973 and 1974, respectively, but respondent seized the amounts and applied them against the principal portion of the jeopardy assessment for the taxable years 1963 through 1967. Those amounts, while voluntary payments for 1973 and 1974, were involuntary payments for 1963-67, as respondent contends. Petitioners thus had no right to direct their application to the interest portion of the jeopardy assessment, and are entitled to no interest expense deductions therefor. However, on their 1974 return, petitioners claimed an overpayment in tax of $9,542, and directed that such overpayment be applied against the interest part of their tax liabilities for 1963-67. We hold this was a voluntary payment made at the time of filing their return. Petitioners' contemporaneous instruction as to its application was thus timely, and entitled them to a deduction in 1975 for interest paid on indebtedness. See O'Dell v. United States,326 F.2d 451, 456 (10th Cir. 1964), affg. an unreported District Court opinion. As a result of our decisions, we need not address the parties' alternate arguments. *515 Decision will be entered under Rule 155.
Footnotes
1. That amount included the claimed refund for 1972 of $33,607.22 which respondent applied to the principal portion of the jeopardy assessments for 1963-1967, rather than to petitioners' 1973 estimated tax, as directed. ↩
2. On this point there is a conflict between the stipulation and the stipulated return itself, and we have resolved any conflict by taking the information directly from the return.↩
3. Respondent, by focusing on his assignment of income theory, has ignored and failed to argue the issue of constructive receipt with respect to Stone.↩
4. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
5. Indeed at this time, the resolution of complex multimillion dollar lawsuits were many years away and subject to many uncertainties. The civil fraud litigation was only recently resolved, and the opinion issued by this Court in the tax controversy is now the subject of a motion for reconsideration.↩
6. To be consistent with the due process clause of the 14th Amendment to the Constitution, however, the nonresident must have sufficient contacts with Delaware to meet the International Shoe Co. v. Washington,326 U.S. 310, 316 (1945) standards of "fair play and substantial justice." Shaffer v. Heitner,433 U.S. 186↩ (1977). 7. Del. Code Ann. tit. 10 sec. 366 (1975 & Supp. 1980) provides: (a) If it appears in any complaint filed in the Court of Chancery that the defendant or any one or more of the defendants is a nonresident of the State, the Court may make an order directing such nonresident defendant or defendants to appear by a day certain to be designated. Such order shall be served on such nonresident defendant or defendants by mail or otherwise, if practicable, and shall be published in such manner as the Court directs, not less than once a week for 3 consecutive weeks. The Court may compel the appearance of the defendant by the seizure of all or any part of his property, which property may be sold under the order of the Court to pay the demand of the plaintiff, if the defendant does not appear, or otherwise defaults. Any defendant whose property shall have been so seized and who shall have entered a general appearance in the cause may, upon notice to the plaintiff, petition the Court for an order releasing such property or any part thereof from the seizure. The Court shall release such property unless the plaintiff shall satisfy the Court that because of other circumstances there is a reasonable possibility that such release may render it substantially less likely that plaintiff will obtain satisfaction of any judgment secured. If such petition shall not be granted, or if no such petition shall be filed, such property shall remain subject to seizure and may be sold to satisfy any judgment entered in the cause. The Court may at any time release such property or any part thereof upon the giving of sufficient security. (b) The Court may make all necessary rules respecting the form of process, the manner of issuance and return thereof, the release of such property from seizure and for the sale of the property so seized, and may require the plaintiff to give approved security to abide any order of the Court respecting the property.
(c) Any transfer or assignment of the property so seized after the seizure thereof shall be void and after the sale of the property is made and confirmed, the purchaser shall be entitled to and have all the right, title and interest of the defendant in and to the property so seized and sold and such sale and confirmation shall transfer to the purchaser all the right, title and interest of the defendant in and to the property as fully as if the defendant had transferred the same to the purchaser in accordance with law.↩
8. Sec. 163 provides in part as follows: (a) General Rule.↩--There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.
9. An involuntary payment of Federal taxes means any payment received by agents of the United States as a result of distraint or levy or from a legal proceeding in which the Government is seeking to collect its delinquent taxes or file a claim therefor. * * * [Amos v. Commissioner,47 T.C. 65, 69↩ (1966).]
10. Respondent erroneously argues collection activity could not have been undertaken immediately, as a "notice of assessment must be given within 60 days after assessment and the taxpayer is given 10 days to either pay the tax or file a bond. Section 6861; Treas. Reg. § 301↩. 6861-1(d)." Respondent has confused the notice and demand which follows an assessment with a notice of deficiency which must be sent to a taxpayer within 60 days after the jeopardy assessment, giving a taxpayer the opportunity to file a petition in this Court. Compare sec. 6861(a) with sec. 6861(b) and sec. 6212(a). 11. In 1972, in addition to the levy served upon the Trust Company, there were levies served upon bank deposits of petitioners in the St. Louis area and in New York, and upon a brokerage account at Merrill Lynch. Given the date of the levy upon the Trust Company (February 8, 1972), it is probable those levies were also made shortly after the February 7, 1972, assessment.↩