NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4080
_____

HARRY E CRISCI,

Appellant

v.

UNITED STATES OF AMERICA

v.

CAROLE L. MCCONNELL; H. BRIAN CRISCI
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 07-cv-01331)
District Judge:  Honorable David Stewart Cercone
_____

Submitted Under Third Circuit LAR 34.1(a)
October 22, 2010

Before:  HARDIMAN, GREENAWAY, JR. and NYGAARD, *Circuit Judges*.

(Filed: October 22, 2010)
_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Harry E. Crisci appeals the District Court's summary judgment in favor of the

Government on his claim for the return of funds seized by the Internal Revenue Service in partial satisfaction of corporate tax liabilities. We will affirm largely for the reasons articulated by the District Court.

## I.

Because we write for the parties, we recount only the essential facts.

## A.

Harry Crisci was the majority shareholder and owner of a company called Ideas in Motion, Inc. (the Company). His two children, Brian Crisci and Carole McConnell, were the Company's President and Controller, respectively.[1] In 2003 and 2004, the Company incurred tax liabilities totaling over $400,000, almost half of which were "trust-fund taxes."[2] Under the Internal Revenue Code, any individual responsible for the collection of, accounting for, and payment of trust-fund taxes who willfully fails to perform these obligations may be held personally liable for a penalty equal to the amount of the trust-fund taxes owed. 26 U.S.C. § 6672(a). Under this provision, the IRS could hold the Criscis personally liable for the Company's trust-fund taxes. All other corporate taxes were assessable only against the Company, which could obtain a discharge through

_____

1 We refer to Harry Crisci and his two children, including McConnell, as "the Criscis."

2 "Trust-fund" taxes are those that employers withhold from employees' paychecks to account for their income and Social Security taxes pursuant to 26 U.S.C. §§ 3102(a), 3402(a). These taxes must "be held to be a special fund in trust for the United States." 26 U.S.C. § 7501(a); *see also Slodov v. United States*, 436 U.S. 238, 242–45 (1978).

bankruptcy. *United States v. Pepperman*, 976 F.2d 123, 130 (3d Cir. 1992) ("[A]lthough trust fund taxes technically are nondischargeable in bankruptcy . . . corporate dissolution has the practical effect of discharging the corporate debtor from its unpaid tax liabilities." (citations omitted)).

Several times in 2003 and 2004, the IRS issued to Crisci Notice and Demand for Payment and Notice of Intent to Levy letters. On November 30, 2004, IRS Officers Robert Allingham and William Evans (collectively, Officers) met with the Criscis to discuss the unpaid taxes. The Criscis' subsequent communications with the Officers left them with the impression that their best course of action was to sell the Company's assets at auction and voluntarily turn over the proceeds to the IRS, specifically directing payment to go first towards their trust-fund liabilities.[3]

The Criscis planned, organized, and executed an auction of the Company's assets, which raised $192,210.31 after expenses. Upon learning that Brian Crisci had contacted the auctioneer and requested payment of the auction proceeds to the Company, however, Allingham issued a Notice of Levy to secure the funds. Because the proceeds were seized, they were classified as involuntary payments and, at the discretion of the IRS,

---

3

The distinction between "voluntary" and "involuntary" payment is significant. The Supreme Court has recognized that "IRS policy permits taxpayers who 'voluntarily' submit payments to the IRS to designate the tax liability to which it will apply." *United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 548 (1990); *see also In re Kaplan*, 104 F.3d 589, 596 n.16 (3d Cir. 1997). No similar courtesy is extended to taxpayers against whom payment is levied. *Muntwyler v. United States*, 703 F.2d 1030, 1032 (7th Cir. 1983) ("When a payment is involuntary, IRS policy is to allocate the payments as it sees fit.").

applied first to the Company's non-trust-fund tax debt with the remainder applied to the Company's outstanding trust-fund taxes. Thus, $161,090.62 was credited to corporate taxes and only $31,119.69 to trust-fund taxes, leaving the Criscis personally liable for the lion's share of the trust-fund liabilities. After the Company declared bankruptcy in 2005, the IRS assessed a $177,182.51 penalty against the Criscis, and Harry Crisci paid the full amount.

Crisci brought suit seeking return of the payment and alleging that the Criscis' interactions with the Officers equitably estopped the IRS from seizing the auction proceeds as an involuntary payment. Crisci claims the Officers' misrepresentations and omissions induced the Criscis' detrimental reliance by leading them to believe they could voluntarily satisfy their trust-fund tax liabilities with the proceeds of the auction. According to Crisci, this alleged failure by the Officers to "speak up" upon realizing that the Criscis misunderstood the situation rises to the level of affirmative misconduct.

## B.

The District Court granted summary judgment for the government, holding that Crisci failed to satisfy three of the four essential elements of an equitable estoppel claim against the government. Viewing the evidence in the light most favorable to Crisci, the District Court found that, although Crisci might be able to establish a misrepresentation, there was insufficient evidence to support the elements of affirmative misconduct or detrimental reliance. *See United States v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987). This

4

appeal followed.

## II.

We review the District Court's summary judgment *de novo*, and we apply the same standard as the District Court. *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010).

## A.

First, we agree with the District Court that Crisci failed to present sufficient evidence that any misrepresentation by the Officers rose to the level of affirmative misconduct.[4] "Not every form of official misinformation will be considered sufficient to estop the government," *Fredericks*, 126 F.3d 433, 438 (3d Cir. 1997), and erroneous oral advice, mere negligence, mistakes of law, and simple omissions by government officials do not qualify as affirmative misconduct. *See, e.g.*, *id.*; *Bachner v. Comm'r of I.R.S.*, 81 F.3d 1274, 1282 (3d Cir. 1996); *Pepperman*, 976 F.2d at 131.[5] Crisci was therefore

---

[4] The District Court implicitly recognized, and we agree, that the evidence on the record raises many questions as to what exactly the Criscis believed about their settlement options and how they arrived at their misunderstandings. Throughout the pleadings, depositions, declarations, and briefs, the Criscis make a number of assertions about their interactions with the Officers, including several that might support a finding that the Officers made accidental or implied misstatements. But none of the evidence suggests that either Officer made any affirmative or intentional misrepresentation.

5 Crisci attempts to distinguish *Pepperman* on the grounds that it dealt with a Chapter 7 bankruptcy, so there was no chance that any payment to the IRS could be treated as "voluntary." But this case turned on the absence of affirmative misconduct, not on the voluntary/involuntary payment distinction.

required to present evidence of a more explicit misrepresentation.

Crisci's description of the Government's behavior is belied by the record. He contends that the Officers "[f]iguratively played 'Gotcha!'" and engaged in conduct that was "simply in [sic] inequitable - - if not despicable." Appellant's Br. at 10, 22. But none of the Criscis testified that the Officers ever promised to apply the auction proceeds to trust-fund liabilities before general corporate taxes. Instead, the record is full of references to vague conversations and ambiguous statements about typical IRS procedures or options for individuals facing tax debts.

When read in the light most favorable to Crisci, one could infer that the Officers negligently misrepresented their intentions to the Criscis; however, there is no evidence of affirmative misconduct. And Crisci provides no evidence that the Officers ever agreed,

orally or in writing, to any compromise that would forgive trust-fund liabilities.[6]

---

[6] Crisci disputes the government's use of the word "forgive," arguing that:

> [T]he record is clear that the parties merely discussed the agent's candid acknowledgement that, as a practical matter, financially stressed companies such as IIM-PA, Inc. often cannot pay all taxes due and that tax payments made on behalf of such corporate entities typically are designated for application to trust fund taxes before application to general corporate tax liabilities.

Crisci relies on *Dana Corporation v. United States*, 470 F.2d 1032 (Ct. Cl. 1972), to support his assertion that a government official's silence under circumstances where "equity and principles of fairness require that the government representative speak up or make disclosure" can alone constitute affirmative misconduct. Appellant's Br. at 14. This argument fails for two reasons. First, Crisci provided insufficient evidence that "equity [or] principles of fairness" should have compelled the Officers to explain anything to the Criscis. The fact that the Criscis came away from their conversations with the Officers thinking they had reached an agreement with the IRS about how the auction proceeds would be applied does not mean that the Officers were responsible for that misunderstanding or that it was affirmative misconduct for the Officers not to rectify it. Crisci failed to cite evidence that the Officers even knew what the Criscis were thinking, much less that the Officers violated some notion of fairness by not making sure that the Criscis understood that the IRS really meant what it said in its written notices. *Dana* is therefore factually inapposite.

Second, even if Crisci could proffer evidence that the Officers should have corrected the Criscis' misunderstandings, we are aware of no binding authority holding

Appellants' Reply Br. at 5. This attempt to reframe the parties' interactions demonstrates that the Officers never made any promises to the Criscis regarding treatment of the auction proceeds. Ultimately, Crisci faces a dilemma in framing his claim: if the government reached a compromise with the Criscis and then violated it, that would be obvious misconduct; however, such a compromise would be beyond the scope of the Officers' authority and therefore unreasonable to rely upon, so Crisci's claim would fail as a matter of law for reasons discussed in Part II.B, *infra*.

that government officials' silence can, on its own, constitute affirmative misconduct.[7] We decline to so extend our definition of "affirmative misconduct" in this case, where Crisci's evidence shows that the only misrepresentations by the Officers were either ambiguous or beyond the scope of their authority. *See infra* Part II.B. To do otherwise would impose a greater social cost than any equity that might be achieved from vindicating Crisci's estoppel claim. *See Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60 (1984) ("[W]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined.").

## B.

Crisci next challenges the District Court's conclusion that he did not *reasonably* rely on the Officers' statements. We first find that because the Officers' alleged misrepresentations were all oral, it was unreasonable for Crisci to rely on them. The Supreme Court stated in *Heckler* that "[t]he necessity for ensuring that governmental

7 Crisci cites two of our decisions to bolster *Dana*, but both are inapposite. In *Ritter v. United States*, we stated: "[t]he acts or omissions of the Officers of the government, if they be authorized to bind the United States in a particular transaction, will work estoppel against the government." 28 F.2d 265, 267 (3d Cir. 1928) (emphasis added). However, the *Ritter* court made no findings as to any "omission" on the part of a government official, instead relying on the official's lack of authority as a basis for rejecting the equitable estoppel claim. *Id.* In *Fredericks*, we cited *Dana* with approval but did so under very different circumstances, where IRS officers repeatedly and unequivocally misrepresented facts to a taxpayer and then failed to correct those statements in light of new information, thus elevating the silence to a "perpetuation of its misrepresentation." 126 F.3d at 440–42.

8

agents stay within the lawful scope of their authority, and that those who seek public funds act with scrupulous exactitude, argues strongly for the conclusion that an estoppel cannot be erected on the basis of the oral advice." 467 U.S. at 65. Several courts of appeals have cited *Heckler* in support of their holdings that oral representations can never estop the government, regardless of the circumstances. *See, e.g.*, *United States v. Vanhorn*, 20 F.3d 104, 112 n.19 (4th Cir. 1994); *FDIC v. Royal Park No. 14*, 2 F.3d 637, 641 (5th Cir. 1993); *United States v. Boccanfuso*, 882 F.2d 666, 670 (2d Cir. 1989); *Falcone v. Pierce*, 864 F.2d 226, 230 (1st Cir. 1988).[8] Similarly in *Fredericks*, we stated that "Fredericks' reliance would have been unreasonable had it been based solely on the initial oral misrepresentation." 126 F.3d at 442.

Crisci's reliance on oral representations was particularly unreasonable in light of the written notices issued by the IRS. The Notice and Demand for Payment and Notice of Intent to Levy letters informed the Criscis of the amount of their debt and the IRS's right to seize assets to satisfy those debts. Those documents rendered it even less reasonable

---

8 Crisci urges us to distinguish *Heckler*, in part, on the basis that in *Heckler*, "the court found that the defendant health system had not acted reasonably in relying on a low-ranking Medicare representative's oral representations that were directly contrary to explicit Medicare regulations." Appellant's Br. at 28. We find that these facts are quite comparable to those in the case now before us because Crisci relied on officers whose rank within the IRS he did not even know at the time. Although the party seeking estoppel in *Heckler* may have been more sophisticated in the relevant law than were the Criscis, we are mindful that, "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Heckler*, 467 U.S. at 63.

9

for Crisci to rely on any oral representations by the Officers.

Moreover, we have stated that the government may be estopped only when its employees are "authorized to bind the United States in a particular transaction, [and] if the Officers have acted within the scope of their authority." *Ritter*, 28 F.2d at 267; *see also Walsonavich v. United States*, 335 F.2d 96 (3d Cir. 1964). Even had the Officers agreed that the proceeds of the Criscis' auction would be applied first to trust-fund taxes, such an agreement would have exceeded the scope of the Officers' authority because the Internal Revenue Code requires compromises of tax liability to be authorized by the Secretary of the Treasury or his delegate *and* be in writing. 26 U.S.C. § 7121(a).[9] It is irrelevant that Crisci was likely unaware that the Officers were acting *ultra vires* to the extent they purported to make an oral compromise. *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947) ("[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."); *see also Gov't of the V.I. v. Gordon*, 244 F.2d 818, 821 (3d Cir. 1957). Accordingly, the District Court did not err when it held that Crisci failed to satisfy the reasonable reliance prong.

III.

---

9 Crisci attempts to salvage his claim by arguing that the Officers and Criscis never reached a compromise, but merely engaged in a "conversation on collection of outstanding tax liabilities." Appellant's Reply Br. at 9. But as we have explained, *see* note 7, *supra*, such discussions would not amount to misrepresentations or affirmative misconduct.

10

For the foregoing reasons, we will affirm the District Court's grant of summary judgment. Because Crisci failed to satisfy the elements of an equitable estoppel claim against the government, we need not discuss the Government's alternative Appropriations Clause or unclean hands arguments.