**UNITED STATES of America**

v.

**Dominick LAROSA and Catherine LaRosa.**

**Civil Action No. DKC 96–980.**

United States District Court, D. Maryland.

Oct. 23, 1997.

James J. Wilkinson, U.S. Dept. of Justice, Washington, DC, for U.S.

Robert G. Nath, Odin, Feldman & Pittleman, P.C., Fairfax, VA, for Defendants.

## MEMORANDUM OPINION

CHASANOW, District Judge.

This is an action brought by the United States of America ("Government") to recover

refunds of interest on tax underpayments which it claims the Internal Revenue Service ("IRS") erroneously issued to defendants Dominick LaRosa and Catherine LaRosa ("Defendants") for the years 1981 and 1982. In turn, Defendants have filed a counterclaim seeking a larger refund than the IRS granted. Both parties have moved for summary judgment on all claims. No hearing is deemed necessary and the court now rules pursuant to Local Rule 105.6.

## I. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. Anderson, 477 U.S. at 250; see also Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir.1987); Morrison v. Nissan Motor Co., Ltd., 601 F.2d 139, 141 (4th Cir.1979); Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R.Civ.P. 56(c); Pulliam Inv. Co., 810 F.2d at 1286 (citing Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Gill v. Rollins Protective Servs. Co., 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 323. Thus, on those issues on which

the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. Anderson, 477 U.S. at 256.

In Celotex Corp., the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will ¸bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

Celotex Corp., 477 U.S. at 324. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " Barwick v. Celotex Corp., 736 F.2d 946, 958–59 (4th Cir.1984) (quoting Seago v. North Carolina Theatres, Inc., 42 F.R.D. 627, 632 (E.D.N.C.1966), aff'd, 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (citations omitted).

## II. Factual Background

This proceeding is only the latest wrangling in a conflict which first erupted between the IRS and the LaRosas in the mid–1980s. These matters have involved the IRS, Defendants, Dominick LaRosa's brother, Joseph LaRosa, his father, Pietro LaRosa, and the family business, The LaRosa's International Fuel Co., Inc. (collectively "The LaRosas.") This is the second time that issues in this case have come before the federal courts in this Circuit, and prior proceedings have also been held before the United States Tax Court on more than one

occasion. The parties have also apparently invested a great deal of time in negotiations. After Maryland state officials began to scrutinize the LaRosa's business activities in the mid–1980s, the IRS instituted its own investigation. Dominick LaRosa, Joseph LaRosa, and the LaRosa's International Fuel Co., Inc. were convicted on December 2, 1985 of tax evasion in Maryland state court—convictions for which they were pardoned by Governor William Donald Schaefer in 1992.[1]

The IRS made a jeopardy assessment and levied on the LaRosas' assets on December 3, 1985 and the parties subsequently entered into an escrow agreement on January 16, 1986. Pursuant to the agreement, the LaRosas' assets were placed in escrow pending a determination of their federal tax liability. The escrow agreement prevented the IRS from liquidating the assets and stipulated that the assets were not taken as payment of any federal tax. While the assets were in escrow, the IRS controlled the funds, and the LaRosas needed approval for their household, legal, and other expenses.

In 1991, the parties reached a settlement which the United States Tax Court approved. *See LaRosa v. Commissioner of Internal Revenue,* Docket No. 6171–86. The parties agreed that the LaRosas had underpaid their taxes for the years 1981, 1982, and 1983 and that they had overpaid their taxes for the years 1984 and 1985. For purposes of the settlement, the parties agreed that the underpayments plus interest and penalties totaled $9,744,587 and that the overpayments plus interest totaled $6,120,204.[2] By check, the LaRosas paid the Government the difference of $3,624,583.

The terms of the settlement specifically allowed the LaRosas to litigate in federal court the issue of interest assessed by the IRS. Subsequently, the LaRosas applied to the IRS for a refund claiming that interest should not have accrued after December 3, 1985, the date of the jeopardy assessment.

That request was denied initially. In 1994, however, after intervention by the LaRosas' congressional representative, the IRS issued an apologetic letter and a refund. According to the parties, the IRS reasoned that the underpayments had been rectified as of the date of the receipt of the overpayments, and therefore interest on the underpayments should have ceased as of the dates of the overpayments. The IRS abated $271,800 of 1981 interest and found that $239,651 of interest had accrued on that amount. The IRS also abated $827,658 of 1982 interest and found that $191,776 in interest had accrued on that amount. The IRS issued Defendants refunds which totaled $1,477,324.22 and a credit to their 1986 tax year of $53,561.28 resulting in a total refund of $1,530,085.50. Thus, although the LaRosas' original request for a refund was denied, the IRS used an alternative method to declare a refund. It is this refund which is presently at issue.

### III. The Parties' Respective Positions

#### A. The Government's Claim

The Government claims that § 7405(b) entitles it to a return of the $1,530,085.50 plus interest as an erroneous refund. *See* 26 U.S.C. § 7405(b) (1994). Through its various filings, the Government has asserted a three-pronged argument.

First, the Government asserts that the refund was erroneous because the original calculations were correctly made under the provisions of § 6601(a) of the Internal Revenue Code ("IRC") which provides for the accrual of interest on past due tax liabilities until those liabilities are paid. *See* 26 U.S.C. § 6601(a) (1994). The Government argues that rather than crediting the LaRosas' overpayments against the prior underpayments, it issued a refund of the overpayments in the form of the transfer on May 1, 1991. In other words, what appears as a credit merely was a refund which saved the step of the

---

1. It is odd that Defendants reacted with such outrage at the Government's mention of the LaRosas' state court convictions in regard to the initial assessment. The LaRosas had referred to the convictions in their IRS refund request, which they entered into the record as an exhibit to their Answer and Counterclaim.

2. The overpayments arose because income which the LaRosas had claimed on the returns for the later years was transferred back to the prior years. The result was an overpayment for the years 1984 and 1985.

Government handing a check to the LaRosas only to have the LaRosas hand a larger check back to the Government. As the argument goes, if the money was refunded then the overpayments never directly satisfied the underpayments and interest continued to run until the refund and check satisfied the liability on May 1, 1991. The Government points to a notation in Dominick LaRosa's brother Joseph LaRosa's records that the overpayment amounts constituted a "refund." The declaration of the IRS's Bedell Terry, Assistant Chief in charge of the Collections Division in Baltimore at the time, states that he gave the LaRosas the option of receiving the overpayment amount as a refund but not as a credit. Additionally, the Government argues that the allowance of interest, which it asserts would not have been allowable on a credit pursuant to IRC § 6611(b)(1), but would have been allowable on a refund pursuant to IRC § 6611(b)(2), demonstrates that the overpayment was refunded. *See* 26 U.S.C. § 6611(b) (1994).

For their part, Defendants contend that the IRS actions were consistent with the application of a credit rather than a refund of the overpayment, thus the provisions of IRC § 6601(f) applied to stop the running of interest. Defendants also note that the amounts of the overpayments were sufficient, without the addition of interest, to pay the entire balance of the underpayments as of the 1985 overpayment. Therefore, they argue that the question of interest on the overpayments "does not even apply."

Defendants' argument is summarized as follows. When it receives an overpayment, the IRS may exercise its discretion to "credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax." 26 U.S.C. § 6402(a) (1994). The Commissioner thus has the option of making a credit or issuing a refund. *See Northern States Power Co. v. United States,* 73 F.3d 764, 767 (8th Cir.1996) (holding that the "the IRS has discretion whether to credit an overpayment to that liability or not"), *cert. denied,* —— U.S. ——, 117 S.Ct. 168, 136 L.Ed.2d 110 (1996); *Pettibone Corp. v. United States,* 34 F.3d 536, 538 (7th Cir.1994)

(statute "leaves to the Commissioner's discretion whether to apply overpayments to delinquencies or to refund them to the taxpayer"). Issuance of a credit by the Commissioner triggers the effects of § 6601(f). *See Northern Power Co.,* 73 F.3d at 768 ("[T]he IRS may credit an overpayment against an outstanding liability, and if it does, Section 6601(f)'s netting provision comes into play."). This section provides:

> If any portion of a tax is satisfied by credit of an overpayment, then no interest shall be imposed under this section on the portion of the tax so satisfied for any period during which, if the credit had not been made, interest would have been allowable with respect to such overpayment.

26 U.S.C. § 6601(f) (1994). Therefore, Defendants argue that, as the IRS exercised its discretion to apply a credit, interest on the underpayments should have ceased to accrue as of the dates of the overpayments. This is apparently the rationale which the IRS used to determine that a refund was due.

As the second prong of its argument, the Government asserts that even if the overpayments are treated as having been credited ("netted") against the underpayments, the particularities of this case prevent the interest halting effects of § 6601(f) from applying to the LaRosas' underpayments. The United States posits that the "interest allowable" language indicates that interest should not have been calculated because interest "had already been allowed on the tax overpayments from the dates they arose to April 30, 1991." This interpretation of the "interest allowable" language leads to the argument that the accrual of interest on the overpayment operated to negate the effect of stopping the interest on underpayments. The interest was no longer merely "allowable," the Government posits, because the IRS had "allowed" it.

In response, Defendants have argued that the language of § 6601(f) can be read to demonstrate that interest must have stopped running. The statute, they argue, means that determination of whether interest stopped depends on whether interest would have been due on the overpayment had no credit been made. As interest clearly would

have been allowable if the overpayment had been refunded, they argue, then the interest allowable prong is satisfied.

Finally, the United States argues that cessation of interest on the underpayments pursuant to § 6601(f) must be accompanied by a cessation of interest owed on the overpayments. For support, the Government points to § 6611 which governs interest on overpayments. The relevant language is as follows:

(a) Rate—Interest shall be allowed and paid upon any overpayment in respect of any internal revenue tax . . .

(b) Period—Such interest shall be allowed and paid as follows:

(1) Credits—In the case of a credit, from the date of the overpayment to the due date of the amount against which the credit is taken.

(2) Refunds—In the case of a refund, from the date of the overpayment to . . . the date of the refund check.

26 U.S.C. § 6611 (1994). The Government thus argues that, for interest to be allowed on a credited overpayment, the underpayment against which the credit is taken must arise subsequent to the overpayment. Although it admits that it could not find judicial authority on point, the Government provides scholarly support for its contention.[3] Defendants have argued that the language of § 6611 simply does not apply to the situation where a credit is taken against a prior underpayment. Further, they note that the reasoning which one of the scholarly sources uses—that the Government does not have use of the money prior to the underpayment and thus owes no interest—is not applicable to the situation at bar. Defendants argue that the Government did in fact have use of the money prior to the settlement. Defendants also contend that the overpayments are not involved in this suit due to the principle that each tax year stands alone. Additionally, Defendants argue that § 6402(a) allows for the crediting of an overpayment and "interest allowed thereon." Thus, they argue that it is irrelevant whether the interest was

allowable in that the IRS allowed the interest.

Finally, Defendants have also argued that the Government should be estopped from recovering the refund. They claim to have reasonably relied on the IRS's issuance of the refunds to their detriment.

**B. Defendants' Counterclaim**

Defendants have argued that not only are they entitled to keep the refund which the IRS issued, but they are also entitled to an additional refund for two separate reasons. First, Defendants argue that interest was improperly charged on fraud penalties assessed in conjunction with the settlement. Second, they argue that the IRS improperly rejected the reasoning in Defendants' refund request that interest should have stopped running even earlier than the dates which the IRS used in granting the contested refund.

As for the fraud penalty interest, Defendants have argued that no interest should have accrued before the tax court's decision became final. For support they point to IRC § 6601(e)(2) which prevents interest from accruing on a penalty before ten days have passed from notice and demand for payment. See 26 U.S.C. § 6601(e)(2) (1994). As they claim that pursuant to IRC § 6213(a), 26 U.S.C. § 6213(a) (1994), the IRS could not assess the penalty before the tax court's decision became final, no interest should have accrued as the penalty was promptly paid. This issue was not before the IRS on the LaRosas' refund request. Rather than argue the merits, the Government asserts that the Government is immune from a claim for a larger refund within the context of an action brought under § 7405(b).

Defendants also argue that they were due a larger refund because December 3, 1985 (the date of the jeopardy assessment) should have been the date on which interest stopped running. They begin by asserting this Court's jurisdiction over the claim for refund. They note that the elements required to establish jurisdiction are: (a) full payment of

---

**3.** The Government points to 14 Stand. Fed. Tax Rep. (CCH) ¶ 40,335.011 and M. SALTZMAN, IRS PRACTICE AND PROCEDURE, ¶ 6.03(1)(b) (2d ed.1996).

the tax assessed; (b) timely filing of a refund claim; and © timely filing of the refund suit. They argue that the interest sought to be abated was fully paid, that the refund claim was filed within two years of the payment date, and that the counterclaim was filed within two years of the claim denial.

For their argument that interest should have stopped running on their liability as of the date of the levy, Defendants rely upon case law to assert that the issuance of a levy reduces the property involved to the constructive possession of the Government. Once the property is in the constructive possession of the Government, they argue, interest is tolled even if the Government does not act expeditiously to liquidate. Defendants point to the tax court's 1987 holding in *Stone v. Commissioner of Internal Revenue, Memorandum Sur Order*, Docket No. 5311–72 and *Stone v. Commissioner*, 47 T.C.M. (CCH) 1502 (1984). There, the IRS issued a levy against an escrow account which Stone had established under an agreement with the Department of Justice. In a decision which did not involve the taxpayer, the IRS chose not to seize the account immediately. The court held that the IRS had constructive possession of the funds in the escrow account as of the date of the levies because they could have ordered the bank to turn over the assets. The taxpayer was not held liable for the IRS's decision not to liquidate the accounts, and interest was thus held to cease as of the date of the levy.

Similarly Defendants point to *United States v. Barlow's, Inc.*, 767 F.2d 1098 (4th Cir.1985), where the court held that interest ceased to accrue because the IRS had failed to conduct a prompt sale of the taxpayer's property "as soon as practical." In *Barlow's*, the taxpayer and IRS had agreed on the liability owed and the taxpayer had asked the IRS to levy on a debt owed to it by a third-party. The IRS levied, but rather than collect the entire liability, and without the involvement of the taxpayer, it entered into a payment agreement with the third-party under which the third-party defaulted. The court reasoned that the IRS's failure to collect the debt canceled the taxpayer's obligation to pay interest.

Defendants contend that the January 1986 escrow agreement does not differentiate this case from other levy situations where interest has been tolled because of the Government's constructive possession. Their main argument is that the IRS's concurrence in entering the escrow agreement was equivalent to their concurrence with the third-party in *Barlow's* or the bank in *Stone*. Alternatively, they assert that the escrow should be ignored as the LaRosas were coerced by IRS agents who were threatening to liquidate Defendants' assets. Assuming the validity of the escrow agreement, Defendants assert that it is irrelevant that a portion of the money was used to pay for the LaRosas' living expenses as they had no access to the principal, and the principal was at all times sufficient to pay the tax liability. Additionally, they claim that it is relevant that the value of the assets against which the IRS levied far exceeded the eventual liability.

Alternatively, Defendants argue that the IRS's cash-bond deposit procedure also supports their claim. *See* Rev.Proc. 84–58, 1984–2 C.B. 501. Under the cash bond procedure, the taxpayer's deposit of a cash bond stops interest from running unless the taxpayer revokes the bond. Even if the taxpayer attempts to revoke the payment, the IRS can refuse to return the funds if doing so would jeopardize eventual payment. No title is transferred before the eventual determination of the taxpayer's liability.

In response, the Government asserts that the precedent which Defendants rely upon is distinguishable, that the escrow was not entered into by way of Government coercion, that aspects of the escrow agreement demonstrate that the Government did not have constructive possession, and that the escrow account was not a cash bond. As for *Barlow's*, the Government contends that the Fourth Circuit's decision was based upon the IRC's directive that a sale be held as soon as practicable. *See* 26 U.S.C. § 6335 (1994). The Government notes that, unlike in *Barlow's*, the tax liability was disputed and the LaRosas were involved in the IRS's decision to refrain from liquidating. As for *Stone*, the Government argues that the consensual nature of the escrow and the benefits which the

LaRosas received from the escrow, including the eventual return of all of the assets, are relevant distinctions.

Finally, the Government disputes Defendants' contention that the escrow agreement was the equivalent of a cash bond. The Government points out that a cash-bond is considered a payment, whereas the escrow agreement specifically stated that it was not a payment, that the escrow agreement allowed the LaRosas' access to the assets while a bond would not have, and that the money was returned to the LaRosas with interest as opposed to without interest as with a cash bond. The Government asserts that the cash-bond policy results in the Government having use of the funds, while the escrow agreement specifically prevented the Government from liquidating and using the assets or proceeds. Therefore, the Government argues that the policy behind the cessation of interest with a cash bond is absent from the case at bar.

### IV. Analysis

#### A. The Government's Claim

As outlined above, the Government has argued along three lines of reasoning that summary judgment should be entered in its favor. As each of the Government's grounds stand alone, this Court will enter summary judgment in accordance with the standard of review detailed above if no material fact is in dispute with regard to any of these three approaches and either party is entitled to judgment as a matter of law.

■ This discussion begins with the Government's final argument—that the refunds were erroneous because the computations failed to correspondingly abate the overpayment interest. What transpired on May 1, 1991 with regard to the 1984 and 1985 overpayments was either a refund or a credit. If it was a refund, then the law is clear—the subsequent refund of interest paid on the 1981–1983 underpayments was erroneous as no payment for those tax years was received until May 1, 1991 and thus nothing operated to stop interest from accruing on either the underpayment or the overpayment. *See* 26 U.S.C. § 6601(a) (1994); 26 U.S.C. 6611(b) (1994).

■ If, on the other hand, the May 1, 1991 transaction is construed as application of credit of the 1984 and 1985 overpayments against the earlier underpayments as of the dates of the overpayments, then interest should not have run on either the overpayments or the underpayments as of the applicable dates. In this situation, as well, it would be error to abate interest only on the underpayments and not also on the overpayments. The Government would still be entitled to recover the erroneous refund.

The provisions of § 6601(f) only apply when an overpayment is credited. 26 U.S.C. § 6601(f) (1994). Defendants have not claimed otherwise. The interest tolling effects of § 6601(f) create a type of legal fiction that payment was made on a certain prior date. That is what differentiates a credit from a refund, where the money would then need to be turned back over to the Government to satisfy any prior liability and the provisions of § 6601(a) would apply. This fiction is sensible, as it is illogical that the Government would owe any interest to a party which has paid an undisputed liability. Likewise, it would be illogical to charge a taxpayer interest after it had paid its liability. Money can only lie in one pocket. Therefore, if the tax is paid, the funds belong to the Government and the taxpayer has no claim to any interest. Therefore, presuming that netting occurred, the proper figures to use should not have included post-April 15, 1986 interest on either side of the equation. Defendants' argument that the Government had their money prior to the settlement is fallacious, as what the Government had was its own money, if the credit analysis is used. A proper reexamination of the settlement as a credit would have taken this into account. Thus, the Government is entitled to summary judgment on its claim for a recoupment of the refund unless one of Defendants' remaining technical arguments bars that result.

■ Defendants have posited that reexamining the interest allowed on the overpayments was improper given the principle that each tax year stands alone. There is no doubt that this is an axiomatic principle of

our tax system. *See Heiner v. Mellon,* 304 U.S. 271, 275, 58 S.Ct. 926, 82 L.Ed. 1337 (1938); *Commissioner v. Sunnen,* 333 U.S. 591, 598, 68 S.Ct. 715, 92 L.Ed. 898 (1948); *United States v. Consolidated Edison,* 366 U.S. 380, 384–85, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961). However, as the cases which Defendants cite and the cases cited therein reveal, its applicability relates to the timing of the reporting of income and the taking of deductions. It is simply not the case that when an overpayment is credited against an underpayment, a reevaluation of the size of the underpayment does not require a reevaluation of the amount of the overpayment which constituted the credit. To say otherwise would be the equivalent of declaring a refund by only looking at the liability and not at the payment for the year in question. Years when overpayments are made and years when underpayments occur become linked differently than years when income is received which resulted from a business activity or contested liability in a prior year. It is in the latter cases, rather than the former, where the tax year must stand alone.[4]

■ Defendants also argue that because the IRS allowed such interest, whether or not it was allowable, rectifying this error would be improper. The language of § 6402(a) does say that credits consist of "overpayment, including any interest allowed thereon." 26 U.S.C. § 6402(a) (1994). However, when reexamining the question of interest within the framework of a credit, Defendants point to no authority (beside the annual accounting concept dismissed above) which estops the IRS from correcting the mistaken allowance of interest on a credit which clearly should not have been allowed under 6611(b)(1). The scholarly authority which the Government cited, and the IRS's administrative interpretations, which neither party cited, both support the contention that interest on overpayments used for credits is only allowed when the liability occurs subsequent to the overpayment.

■ In 1960, the IRS released Revenue Procedure 60–17, which dealt with the subject of restricted interest—or "provisions in law which limit or prohibit interest under certain conditions." Rev.Proc. 60–17, 1960–2 C.B. 942. In discussing § 6611(b)(1), the Revenue Procedure clearly states that no interest is allowable on an overpayment which is credited against a liability for prior unpaid taxes. *Id.* As Defendants point out, the Supreme Court held in *Helvering v. Winmill,* 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52 (1938), that "[t]reasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." *Id.* 305 U.S. at 83. Thus, if the IRS netted the payments, it was not allowed to credit interest subsequent to the overpayment date. If treated as a credit when correcting the erroneous assessment of interest on the underpayments, the IRS should have correspondingly rectified this error.

■ The Revenue Procedure is also instructive in assuring that the IRS has no authority to grant restricted interest by consent. The Revenue Procedure notes that "[t]he payment of interest is mandatory on underpayments and overpayments of any internal revenue tax unless specifically prohibited by law or by mutual agreement." Rev. Proc. 60–17, 1960–2 C.B. 942. Nowhere does the document state the corollary which Defendants' argument would require—that interest can be allowed by mutual consent when specifically prohibited. Therefore, no technicality bars the Government from seeking restitution of this erroneous refund. As the Government is entitled to summary judgment on the grounds specified above, it is unnecessary to reach the merits of its alternative arguments.

Defendants have also asserted that the Government should be estopped from seeking restitution. The Fourth Circuit's opinion in *Miller v. United States,* 949 F.2d 708 (4th Cir.1991), is instructive in this regard. In that case, Miller was the executor of an

---

4. It is also hard to believe that, after all the emotional turmoil which Defendants claim to have suffered, they would encourage the Government to initiate a separate action to recover overpayment interest for 1984 and 1985.

estate which involved a holographic will. As the residuary clause of the will was vague, Miller filed an action in Virginia state court seeking a determination of the clause's validity. At the same time, he contacted the IRS to determine how much estate tax to pay. The attorney with whom he consulted stated that he should pay the entire amount as any excess would be refunded subsequent to the probate court's finding. The IRS attorney did not advise Miller to file a refund claim and he did not do so until after the statutory period had run. The IRS denied the claim on the ground that it was untimely. The Fourth Circuit affirmed the district court's summary judgment ruling in favor of the IRS. With regard to equitable estoppel, the Fourth Circuit held:

> Under relevant case law, it is clear that neither the government, nor a government agency such as the IRS, can be equitably estopped from asserting its legal rights because of the actions of an agent ... Furthermore, courts expressly have prohibited the application of the doctrine of equitable estoppel in cases involving the IRS.

*Id.* at 712–13 (citations omitted). The Fourth Circuit has also observed that "equity generally plays a very limited role in tax cases." *Webb v. United States,* 66 F.3d 691, 694 (4th Cir.1995), cert. denied, —— U.S. ——, 117 S.Ct. 1079, 137 L.Ed.2d 215 (1997). Furthermore, the statute could not be clearer that the IRS may seek the return of an erroneous refund. *See* 26 U.S.C. § 7405(b) (1994). Barring certain knowledge that a refund was issued in error, it is hard to conjure a case where prior to such suit a taxpayer would not believe that the IRS had acted correctly and would not make use of the refund. While the IRS ought to strive to avoid issuing the type of erroneous refund which occurred in this case, the IRS is permitted to seek to undo such mistakes regardless of who is to blame for the error. There is nothing special about the case at bar in this regard. Therefore, the Government

cannot be estopped from seeking its § 7405(b) rights.

**B. Defendants' Counterclaim**

 In the initial refund request and in their counterclaim, Defendants assert that the jeopardy assessment and levy on their property served to toll the running of interest on the underpayments. This argument here can be restated as "I want my cake and to eat it too." [5] Defendants are correct that the general rule requires the IRS to liquidate assets after a levy, and that the general effect of its failure to do so is to stop interest from running. *See e.g., United States v. Barlow's, Inc.,* 767 F.2d 1098 (4th Cir.1985) (discussed above); 26 U.S.C. § 6335 (1994) (stating that the IRS must conduct a sale "as soon as practicable"). However, the statutory formulation of the IRS's duty as "as soon as practicable" allows this Court to sanction an agreement between the parties which makes liquidation prior to a final tax court decision not practicable. Practical delays can either result from the IRS's own needs or from what the IRS views as within the practical needs of itself and the taxpayer. Here the delay arose because the taxpayer sought it. Furthermore, nothing in the record suggests that Defendants were coerced. As they readily admit, the IRS had unambiguous statutory authority to liquidate the LaRosas' assets. The LaRosas also availed themselves, unsuccessfully, of legal means to challenge the amount of the jeopardy assessment. *See LaRosa v. United States,* 841 F.2d 544 (4th Cir.1988). That the LaRosas held little sway in the negotiations is purely a function of their disadvantageous legal position. Driving a hard bargain does not amount to coercion. Simply put, the IRS did the LaRosas a favor by entering into an escrow agreement which allowed the LaRosas to maintain their business operations. Additionally, the Government is correct in arguing that the relative size of the assessment to the adjudicated liability is irrelevant as the assessment was approved by the courts.

---

**5.** This saying has been used, in various forms, so often that citation to its origin is unnecessary. It appears, however, to derive from George Herbert's 1633 work, *The Size,* where he wrote,

"Wouldst thou both eat thy cake and have it?" *See* John Bartlett, Familiar Quotations, 142 n. 16 (16th ed.1992).

Additionally, Defendants' argument that the escrow agreement was, in essence, a cash bond is meritless. In order to gain the benefits of the cash bond system, the LaRosas should have followed the requirements involved. *See* Rev.Proc. 84–58, 1984–2 C.B. 501. They do not claim to have done so. Creating judicial regimes which parallel regulatory processes is dangerous and courts should avoid doing so. As no statute provides for treating an escrow agreement as a cash bond, such a regime would be the product of equity and, as discussed above, equity has sparse applicability in the tax law context. As Justice Felix Frankfurter wisely counseled, "[O]ne should sail close to the shore of literalness in dealing with the technical problems which are the subject matter of revenue laws." *See Lewyt. Corp. v. Commissioner of Internal Revenue,* 349 U.S. 237, 249, 75 S.Ct. 736, 99 L.Ed. 1029 (1955) (Frankfurter, J. dissenting). The regulations allow for cash bonds and only cash bonds.

Therefore, by mutually consenting to enter into the escrow agreement, the parties relieved the IRS from its § 6335 duty to liquidate and interest continued to run until the date of the overpayment credit or payment. In addition to being legally sound, this result makes the most sense from the standpoint of pragmatism. There are a number of possibilities following an IRS levy. First, the IRS can liquidate. As Defendants submit, such a liquidation would have disastrous side effects on the taxpayer should the assessment be erroneous. As an alternative, the cash bond rules provide an option for a taxpayer who wishes to contest a liability yet ensure itself that the opportunity costs would not include interest. To do so, however, the maker of a cash bond pays the price of losing access to the underlying asset and of never recouping the interest lost pending a final outcome. The escrow arrangement is a solid middle ground for both parties. The IRS is assured that the liability would be paid and the taxpayer does not face the liquidation or complete freeze of its assets. The result for which Defendants' argue would undoubtedly dissuade the IRS from entering into escrow agreements following future jeopardy assessments. Therefore, the legally sound result also happens to generate the best outcome.

Summary judgment in favor of the United States also is appropriate with regard to interest on the fraud penalties. As the Fourth Circuit has held, "[w]ith respect to suits against it for tax refunds, of course, the United States has to some extent waived its sovereign immunity." *Webb v. United States,* 66 F.3d 691, 693 (4th Cir.1995). The same case notes that the statutory provisions allowing for jurisdiction over a refund claim mandate that the petitioner have filed a timely refund claim with the IRS. *Id.* Defendants recognize as much in their own filing where they note that the jurisdictional prerequisites for a refund claim include that the assessment was paid, that the refund claim was timely filed, and that the action before the federal court was also timely. Here, Defendants' refund claim failed to contest the interest which the IRS assessed on the fraud penalties. In order to assert jurisdiction following a refund claim, the claim before the IRS must have specifically addressed any ground on which the District Court action is based. *See Miller v. United States,* 949 F.2d 708, 711 (4th Cir.1991) (noting, within context of informal claim for refund, that a claim need be "sufficiently specific to apprise the IRS that the taxpayer desires a refund and to pin-point the area of dispute, thereby facilitating an examination of the claim if appropriate"). Therefore, this Court would not have original jurisdiction over this aspect of Defendants' counterclaim.

The only avenue for Defendants to assert jurisdiction is if the claim arises under the recoupment exception to Fed.R.Civ.P. 13(d). The recoupment exception allows that "when the United States institutes an action, defendant may assert by way of recoupment any claim arising out of the same transaction or occurrence as the original claim in order to reduce or defeat the Government's recovery." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1427 (1990). Thus, the issue presented here is whether the refund which the Government seeks to recover and a refund for interest incorrectly charged on the fraud penalties arise out of the same transaction or occurrence.

918

In assessing this issue, the following factors must be examined: (i) whether issues of fact and law raised by the claim and counterclaim are largely the same; (ii) whether substantially the same evidence bears on both claims; and (iii) whether any logical relationship exists between the two claims. *See Whigham v. Beneficial Finance Co.*, 599 F.2d 1322, 1323 (4th Cir.1979). As for the first element, the questions of law which the claim and counterclaim raise are different. The basis of the refund was the abatement of interest on the underpayments. The interest granted on the overpayments was necessarily related as it formed the credit which satisfied the underpayments. The question of when interest would begin to run on a fraud penalty, however, is entirely distinct as it involves entirely different sections of the IRC. This difference is sufficient to overcome the relatively low level of evidentiary difficulty which adjudicating the claim would present and the tangential relationship which exists by virtue of the involvement of both issues within the context of the tax court settlement. Although these issues arise out of the same tax years, this relationship ends there. The assessment of the penalty relates solely to the principal of the underpaid tax rather than any interest due thereon. *See* 26 U.S.C. § 6653(b)(1) (1994) (stating that a fraud penalty is equal to "75 percent of the portion of the underpayment which is attributable to fraud"). Thus, the determination of interest due on the underpayments does not affect the size of the fraud payments. Therefore, Defendants may not assert such a claim under the recoupment exception.

### V. Conclusion

For the foregoing reasons, summary judgment must be entered in favor of the United States both on the Government's claim for restitution of the erroneously granted refund and on Defendants' counterclaims. Defendants are liable to the Government in the amount of $1,530,085.50 plus interest under IRC § 6602 "from the date of the payment of the refund." 26 U.S.C. § 6602 (1994); *see e.g., United States v. Mallah*, 882 F.Supp. 779, 781 (S.D.Ind.1995). Counsel are directed to prepare an appropriate order of judgment.

### ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this ___ day of October, 1997, by the United States District Court for the District of Maryland, ORDERED that:

1. Plaintiff's Motion for Summary Judgment on its claim BE, and the same hereby IS, GRANTED;

2. Plaintiff's Motion for Summary Judgment on Defendants' counterclaim BE and the same hereby IS, GRANTED;

3. Counsel are directed to prepare, jointly if possible, and submit within 10 days a form order of judgment and entering judgment in favor of the United States on all claims; and

4. The Clerk will mail copies of the Memorandum Opinion and this Order to counsel for the parties.