# United States Court of Appeals for the Federal Circuit

2007-5017


LAROSA'S INTERNATIONAL FUEL CO., INC.
and JOSEPH LAROSA,

$\qquad$ Plaintiffs-Appellants,

v.


UNITED STATES,

$\qquad$ Defendant-Appellee.


Thomas F. DeCaro, Jr., DeCaro & Howell, P.C., of Upper Marlboro, Maryland, argued for plaintiffs-appellants.

Ellen Page DelSole, Attorney, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief was Eileen J. O'Connor, Assistant Attorney General.

Appeal from: United States Court of Federal Claims

Judge Thomas C. Wheeler

# United States Court of Appeals for the Federal Circuit

2007-5017

LAROSA'S INTERNATIONAL FUEL CO., INC.
and JOSEPH LAROSA,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

DECIDED: September 18, 2007

Before RADER, SCHALL, and LINN, <u>Circuit Judges</u>.

SCHALL, <u>Circuit Judge</u>.

LaRosa's International Fuel Co., Inc., ("LaRosa Fuel") and Joseph LaRosa (together, "taxpayers") appeal the final judgment of the United States Court of Federal Claims dismissing their consolidated tax refund suits. <u>LaRosa's Int'l Fuel Co. v. United States</u>, Nos. 97-834T, 97-835T (Oct. 30, 2006). In their suits, taxpayers sought to recover interest they paid on unpaid taxes for the period while funds belonging to them were subject to Internal Revenue Service ("IRS") levies and were held in an escrow account established by taxpayers and the IRS. On April 3, 2003, the court granted summary judgment in favor of the United States on taxpayers' refund claims. <u>LaRosa's</u>

Int'l Fuel Co. v. United States, 56 Fed. Cl. 102, 104 (Apr. 3, 2003) (LaRosa I). The court did so after holding that taxpayers were not entitled to recover the interest they had paid because the levies and the placement of their funds in escrow did not constitute the payment of their unpaid taxes, so as to stop the accrual of underpayment interest under section 6601(a) of the Internal Revenue Code ("I.R.C." or "Code"), 26 U.S.C. Subsequently, on October 27, 2006, the court granted summary judgment in favor of taxpayers on the government's counterclaim for additional interest on unpaid taxes. LaRosa's Int'l Fuel Co. v. United States, 73 Fed. Cl. 625, 626-27 (Oct. 27, 2006) (LaRosa II). Shortly thereafter, the court entered final judgment dismissing taxpayers' complaints. Because we find no error in the decision of the Court of Federal Claims in LaRosa I, we affirm.[1]

## BACKGROUND

### I.

LaRosa Fuel is a Maryland corporation that supplies coal to utility companies. Joseph LaRosa is a shareholder of the corporation; his brother, Dominick LaRosa, is the president. On December 3, 1985, the IRS made jeopardy assessments against taxpayers and Dominick LaRosa, totaling $21,208,383 in taxes, penalties, and interest for the tax years 1981 through 1983. Of that amount, almost $12 million was assessed against LaRosa Fuel, almost $800,000 was assessed against Joseph LaRosa, LaRosa I, 56 Fed. Cl. at 103, and almost $8.5 million was assessed against Dominick LaRosa. From December 3, 1985 to December 11, 1985, pursuant to I.R.C. § 6331, the IRS

---

[1] The government has not appealed the decision of the Court of Federal Claims in LaRosa II.

served levy notices on financial institutions holding liquid assets and other property of taxpayers and Dominick LaRosa.

In December of 1985, $169,955 was remitted to the IRS, which was applied to the assessment against Joseph LaRosa. In December of 1985 and January of 1986, a further $114,098 was remitted to the IRS, which was applied to the assessment against LaRosa Fuel. On January 16, 1986, taxpayers and Dominick LaRosa entered into an escrow agreement with the IRS. Pursuant to the agreement, the liquid assets of taxpayers and Dominick LaRosa were placed in an escrow account pending final resolution of their tax liabilities. LaRosa I, 56 Fed. Cl. at 103.

Following the execution of the escrow agreement, the IRS issued notices of deficiencies to taxpayers and Dominick LaRosa, reflecting the tax liabilities that were the subject of the jeopardy assessments. In response, taxpayers and Dominick LaRosa filed petitions in the United States Tax Court contesting the deficiency determinations. LaRosa's Int'l Fuel Co. v. Comm'r, No. 6173-86 (T.C.); LaRosa v. Comm'r, No. 6172-86 (T.C.). Subsequently, in March of 1991, taxpayers and Dominick LaRosa resolved the Tax Court litigation by settling their tax liabilities—including taxes, penalties, and underpayment interest—in three stipulated decisions. Pertinent to this case, the stipulated decision in LaRosa Fuel's case determined that it was liable for deficiencies and additions to taxes totaling $316,324, while the stipulated decision in Joseph LaRosa's case determined that he was liable for deficiencies and additions to taxes totaling $2,331,566. Taxpayers and Dominick LaRosa paid the stipulated amounts out of funds separate from those in the escrow account. The three stipulations expressly reserved for taxpayers and Dominick LaRosa the right "to pursue an action in the

appropriate federal court with respect to the interest claimed to be due by the IRS on the respective deficiencies." LaRosa II, 73 Fed. Cl. at 626. Shortly thereafter, the levies and escrowed funds were released.

II.

In April of 1993, exercising their reserved rights, taxpayers and Dominick LaRosa filed claims with the IRS for the refund of interest. Id. at 627. In their claims, they asserted that they had made excessive interest payments on their former tax liabilities because the IRS had assessed interest after the levies and while their assets remained in escrow. LaRosa I, 56 Fed. Cl. at 103. After the IRS denied the claims, taxpayers filed suit in the Court of Federal Claims seeking a refund of interest payments.[2] In their suits, they argued that from December of 1985 (when the IRS made jeopardy assessments and serviced levy notices), the IRS had actual or constructive possession of their assets. Id. In view of that possession, taxpayers contended, the IRS should have credited the full value of the assets against their tax assessments, which would have stopped the accrual of underpayment interest against them under I.R.C. § 6601(a). Id. Therefore, taxpayers sought a refund of the underpayment interest the government had charged them and which they had paid as part of the stipulated Tax Court settlement. Id. at 103-04.

---

[2]    By order dated March 10, 2003, the cases of LaRosa Fuel and Joseph LaRosa were consolidated before the Court of Federal Claims. LaRosa II, 73 Fed. Cl. at 627.

In due course, after stipulating to the pertinent facts, the parties cross-moved for summary judgment on the issue of underpayment interest. Id. at 104. In their motion, taxpayers urged that the seizure of their assets by levy and the subsequent placement of their funds in escrow amounted to payment of their tax deficiencies. Id. For its part, the government argued that a tax is paid when funds are actually applied to satisfy a tax assessment. Id. Ruling on the cross-motions, the Court of Federal Claims held that the IRS's levy against taxpayers' assets and the placement of their funds in the escrow account did not constitute payment of their tax liability. In its decision, the court relied on the Supreme Court's decision in Rosenman v. United States, 323 U.S. 658 (1945), which the Court of Federal Claims read as standing for the proposition that, in order for a tax liability to be deemed paid, funds actually must be applied to the tax liability. LaRosa I, 56 Fed. Cl. at 104 (citing Rosenman, 323 U.S. at 662). The court stated that "it is not enough to place funds into a 'suspense' account, or escrow, which merely functions as a surety against the future payment of said liability." Id. The court therefore granted summary judgment for the government on the underpayment interest issue.[3] Id. As noted above, the court subsequently granted summary judgment for taxpayers on the government's counterclaim for additional interest on unpaid taxes, a ruling that the government has not appealed. See LaRosa II, 73 Fed. Cl. at 631.

---

[3] Dominick LaRosa independently filed suit for a refund of underpayment interest. He did so by way of a counterclaim in the government's suit against him for the recovery of an erroneous tax refund in federal district court in Maryland. The court rejected his claim. United States v. LaRosa, 993 F. Supp. 907 (D. Md. 1997), aff'd 155 F.3d 562 (4th Cir. 1998) (unpublished table decision).

After judgment was entered dismissing their complaints, taxpayers appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### I.

Pursuant to I.R.C. § 6601, interest on a tax underpayment runs from the date the tax was due until the date the tax is paid.[4] Taxpayers contend that their taxes should be deemed to have been fully paid when the IRS levied on their assets in December of 1985. According to taxpayers, after the attachment of the levy, "the IRS had full dominion and control over the levied assets." Taxpayers argue that the IRS was not required to escrow their funds, and that the IRS's control over their funds was maintained through the transfer to the escrow account and while the funds were in the account. Consequently, taxpayers urge, because there were no unpaid taxes once the IRS levied on their assets and while their funds were in escrow, underpayment interest stopped accruing, and they are entitled to a refund of the interest they paid from the date of the levies until the date of the payments that settled the Tax Court litigation.

The government responds that underpayment interest did not stop accruing at the time of the levies on taxpayers' assets because the IRS did not realize funds from the levies and did not apply taxpayers' funds to satisfy the jeopardy assessments made against taxpayers. The government further argues that this continued to be the case

---

[4]   Subsection 6601(a) of the I.R.C. states in full:

> If any amount of tax imposed by this title (whether required to be shown on a return, or to be paid by stamp or by some other method) is not paid on or before the last date prescribed for payment, interest on such amount at the underpayment rate established under section 6621 shall be paid for the period from such last date to the date paid.

while taxpayers' funds were being held in escrow. Thus, the government argues, the Court of Federal Claims did not err in granting summary judgment in its favor.

The parties' contentions squarely frame the issue before us. The issue is whether taxpayers are entitled to a refund of underpayment interest on the theory that, once the levies on their assets were made and the escrow account was created, the IRS had actual or constructive possession of their assets, thereby constituting payment of their tax liabilities so as to cause underpayment interest to stop accruing. This is an issue of law. We therefore review the decision of the Court of Federal Claims without deference. Mass. Bay Transp. Auth. v. United States, 254 F.3d 1367, 1372 (Fed. Cir. 2001).

II.

For the following reasons, we hold that neither the levies nor the depositing of taxpayers' funds into the escrow account constituted payment of taxpayers' tax liabilities, so as to stop the accrual of underpayment interest under I.R.C. § 6601(a).

A.

I.R.C. § 6331 authorizes the IRS to "levy" upon the property of a taxpayer. That property can be "real or personal, tangible or intangible." I.R.C. § 6331(b). Section 6331 explains that, as used in the Code, the term "levy" includes "the power of distraint and seizure by any means." I.R.C. § 6331(b). Distraint, also termed distress, is "[t]he seizure of another's property to secure the performance of a duty." Black's Law Dictionary (2004). "Distress . . . [is] subject, however, to the right of the owner to have the chattel returned to him [up]on the injury being redressed, or the duty performed, or the demand satisfied or [up]on security being given so to do." Id. (quoting F.A. Enever,

History of the Law of Distress 7-8 (1931) (second and third alterations in original)). I.R.C. § 6332(a) requires the possessor of the property subject to the levy to surrender it to the IRS, while section 6335 allows the IRS to sell the seized property within a ten to forty day window, after giving notice "[a]s soon as practicable." I.R.C. § 6335(a)-(b), (d). Finally, I.R.C. § 6342 explains the hierarchy in which the IRS must apply the proceeds from any sale. I.R.C. § 6342.

The above Code provisions operate to create a system in which the IRS may seize property, sell it, and apply the proceeds from the sale to an outstanding tax liability. In United States v. Whiting Pools, Inc., 462 U.S. 198 (1983), the Supreme Court explained the function of these provisions:

> The Internal Revenue Code's levy and seizure provisions, 26 U.S.C. §§ 6331 and 6332, are special procedural devices available to the IRS to protect and satisfy its liens and are analogous to the remedies available to private secured creditors. They are provisional remedies that do not determine the Service's rights to the seized property, but merely bring the property into the Service's legal custody. At no point does the Service's interest in the property exceed the value of the lien. The IRS is obligated to return to the debtor any surplus from a sale. Ownership of the property is transferred only when the property is sold to a bona fide purchaser at a tax sale. In fact, the tax sale provision itself refers to the debtor as the owner of the property after the seizure but prior to the sale.

462 U.S. at 210-11 (citations omitted). In other words, liens the IRS may put on property "do not transfer ownership of the property to the IRS." Id. at 210.

Taxpayers argue, however, that once various financial institutions turned their funds over to the IRS, the IRS "had full dominion and control over the levied assets." They contend that this full and complete dominion constituted constructive possession of the funds by the IRS. From that premise, taxpayers argue that because no sale was required with respect to cash and cash equivalents in the possession of the IRS, and

because section 6342 requires that the IRS "shall" apply "money realized" under levies to tax liabilities, the levies themselves effectuated a payment.

Taxpayers are mistaken. As seen, section 6331 grants the IRS the power to attach its interest to property via a lien: the IRS gets nothing more than a secured interest. As noted, in Whiting Pools, the Court stated that the remedies provided to the IRS by I.R.C. §§ 6331 and 6332 "are provisional remedies that do not determine the Service's rights to the seized property, but merely bring the property into the Service's legal custody. . . . Ownership of the property is transferred only when the property is sold to a bona fide purchaser at a tax sale." 426 U.S. at 210-11; see Stead v. United States, 419 F.3d 944, 947-48 (9th Cir. 2005) ("[T]he IRS ordinarily does not take title to a levied upon property until the government reaps the proceeds of a tax sale or otherwise collects on the property of the taxpayer. This framework applies to cash and cash equivalents." (Citations omitted)). Moreover, there is nothing unusual or exceptional about claiming a security interest in money. See U.C.C. § 9-312(b)(3) (2006) (requiring possession of money in order to perfect a security interest). In short, we see no reason to treat cash and cash equivalents differently from other forms of property under the same statutory section. Because the IRS does not take ownership of property when it levies, but effectively only has a security interest, the IRS's levy against taxpayers was not a payment of their tax liabilities so as to stop the accrual of interest under I.R.C. § 6601(a).

B.

Neither did the placement of taxpayers' funds in the escrow account constitute the payment of their tax liabilities so as to stop the accrual of interest under I.R.C.

§ 6601(a). The fourth WHEREAS clause of the escrow agreement recited that "the taxpayers and the District Director are willing to make such arrangements as are necessary and proper in order to avoid the necessity for seizure and/or sales of all property of the taxpayers." This clause indicates the mutual intent of the contracting parties to avoid the seizure and sale of taxpayers' property—actions that would have resulted in the payment of the tax liabilities at issue.

Provisions of the escrow agreement following the WHEREAS clauses effectuated the parties' intent. Thus, the IRS was required to "turn over to the Escrow Agents all funds received or to be received, as a result of levies on the taxpayers' bank accounts, brokerage accounts, wages, and any other asset accounts." Further, under the escrow agreement, funds deposited with the Escrow Agents were to be "invested with a federally insured bank or savings and loan in certificates of deposit at the best interest rates then obtainable," and interest obtained was to "accrue to the benefit of taxpayers" and was to be "taxable to them." Under the escrow agreement, there were two Escrow Agents, one representing the IRS and one representing taxpayers, and the agreement provided in pertinent part that escrowed funds could be distributed only after "[t]he parties . . . agreed in writing on the proportion and amount of division and distribution of all or any part of the escrowed funds . . . or [a] federal court of competent jurisdiction . . . entered final judgment determining the tax liability of the taxpayers."[5] Thus, under the terms of the escrow agreement, the IRS could not apply escrowed funds to taxpayers' tax liabilities as a payment without the consent of the Escrow Agents or until a court of

---

[5] During the existence of the escrow account, disbursements were made to taxpayers to pay certain living and business expenses.

competent jurisdiction made a final determination as to those liabilities. Most importantly, the escrow agreement explicitly stated: "This agreement is entered into solely for the purpose of securing the payment of the taxpayers' tax liability <u>and is not to be considered as payment of such liability</u>." (Emphasis added). In sum, the provisions of the escrow agreement make it clear that the deposit of taxpayers' funds in the escrow account was for the purpose of securing the payment of their tax liabilities and did not constitute payment of those liabilities.

Given the terms of the escrow agreement in this case, we think <u>Rosenman</u> is controlling on the question of whether a payment was made. In <u>Rosenman</u>, the taxpayer estate did not know the extent of its tax liability at the time it filed its estate tax return in December of 1934. It therefore remitted under protest a "payment" of $120,000, which the IRS placed in a suspense account. 323 U.S. at 659-70. In 1938, after an audit was completed, the estate was required to pay an additional $10,497 in taxes. <u>Id.</u> The estate then filed for a refund, challenging the amount due based on new deductions. However, because the estate's claim for a refund was filed more than three years after the original $120,000 remittance, the government argued that the claim was barred by the statute of limitations. The Supreme Court rejected the government's argument, stating that the $120,000 remittance was not a payment of tax:

> But on December 24, 1934, the taxpayer did not discharge what he deemed a liability nor pay one that was asserted. There was merely an interim arrangement to cover whatever contingencies the future might define. The tax obligation did not become defined until April 1938. And this is the practical construction which the Government has placed upon such arrangements. The Government does not consider such advances of estimated taxes as tax payments. They are, as it were, payments in escrow.

<u>Id.</u> at 662.

We think that, in view of the terms of the escrow agreement in this case, Rosenman compels the conclusion that the deposit of taxpayers' funds in the escrow account did not constitute the payment of taxes, so as to stop the accrual of underpayment interest under I.R.C. § 6601(a). In this case, taxpayers' funds were held in escrow, and the escrow agreement explicitly stated that placement of their funds in the account did not constitute the payment of taxes.

Faced with the escrow agreement, taxpayers argue that the agreement's description of the escrowed funds as not a payment was a precautionary measure to insure that the Tax Court was not divested of jurisdiction because the Tax Court's jurisdiction depends on a deficiency in tax. We are not persuaded by taxpayers' contentions with respect to the escrow agreement. Taxpayers' argument as to the purpose of the provision stating that the deposit of funds in the escrow account was not to be considered the payment of tax liabilities is undermined by the provisions of the escrow agreement noted above. As discussed, those provisions make it clear that it was the intent of taxpayers and the IRS to structure an arrangement whereby the IRS would have a security interest in taxpayers' assets and taxpayers would have access to their funds as they needed them while they contested their tax liability in the Tax Court. Moreover, even if it is assumed that the purpose of the provision at issue was to facilitate Tax Court jurisdiction, see Baral v. United States, 528 U.S. 431, 439 n.2 (2000) ("[T]he taxpayer will often desire treatment of the remittance as a deposit—even if this means forfeiting the right to interest on an overpayment—in order to preserve jurisdiction in the Tax Court, which depends on the existence of a deficiency, 26 U.S.C. § 6213 (1994 ed. and Supp. III), a deficiency that would be wiped out by treatment of

the remittance as a payment."), the fact remains that the provision accomplished that goal by stating that escrow account funds "were not to be considered as payment" of taxpayers' tax liabilities. In short, whatever its purpose was, the legal effect of the provision was the same. The deposit of funds in the escrow account was not a payment of taxes.

Taxpayers seek to distinguish Rosenman on the ground that, in that case, when the $120,000 remittance was made, there had not yet been an assessment, whereas in this case a jeopardy assessment had been made, against which the escrowed funds could be applied. The problem with taxpayers' attempt to distinguish Rosenman is the escrow agreement. In the agreement, taxpayers and the IRS explicitly agreed that the funds put in the escrow account did not constitute a payment: "This agreement is entered into solely for the purpose of securing the payment of the taxpayers' tax liability and is not to be considered as payment of such liability." It is thus irrelevant that in Rosenman there had not been a jeopardy assessment.

Finally, taxpayers direct our attention to Stone v. Commissioner, mem. sur order, No. 5311-72 (T.C. Mar. 30, 1987). In that case, Stone and the IRS disagreed, inter alia, as to the calculation of interest on a tax deficiency. The IRS had levied on funds in two bank accounts and on an escrow account. Id. 3-5. The funds in the bank accounts were levied on by the IRS in March of 1972, but the banks did not remit the funds to the IRS until about one year later. Id. at 3-4 & n.5. Similarly, the IRS levied on the escrow account in February of 1972, but did not take possession of the escrowed funds until 1980. Id. at 5. The government stipulated that if it had constructive possession of the funds in Stone's bank accounts and the escrow account, then interest on the portion of

the deficiency covered by the funds should cease to run. Id. at 4. The Tax Court held that the government was in constructive possession of the funds in both the bank accounts and the escrow account once it levied on them because it could have demanded payment at any time pursuant to I.R.C. § 6332. Id. at 4-5. Accordingly, interest stopped accruing under I.R.C. § 6601(a). Stone does not help taxpayers, however. In the first place, in this case, the government has not entered the kind of stipulation it did in Stone. Most importantly, in this case, because of the terms of the escrow agreement, the IRS could not have demanded the payment of taxes from funds in the escrow account. At the same time, taxpayers and the IRS stated in the escrow agreement that the placement of funds in the escrow account did not constitute the payment of taxpayers' tax liabilities.

## CONCLUSION

For the forgoing reasons, we hold that neither the IRS's levies nor the placement of taxpayers' funds in the escrow account constituted the payment of taxpayers' tax liabilities so as to stop the accrual of interest under I.R.C. § 6601(a). The final judgment of the Court of Federal Claims denying taxpayers' requests for refunds and dismissing their complaints is therefore

## AFFIRMED.